Brenda LAMPKIN, as Legal Guardian
of Jessica Lampkin and Christine
Lampkin, et al., Plaintiffs,

v.

DISTRICT OF COLUMBIA,
et al., Defendants.

Civ. A. No. 92–910 (RCL).

United States District Court,
District of Columbia.

March 7, 1995.

**118**

James D. Miller, King & Spalding, Maria Foscarinis, Washington, DC, for plaintiffs.

Nadine C. Wilburn, Office of Corp. Counsel, Washington, DC, for defendants.

## MEMORANDUM OPINION

LAMBERTH, District Judge.

Plaintiffs are homeless mothers in their capacity as legal guardians for their school-age children. They seek timely provision of educational services, including transportation to and from school, for homeless children in the District of Columbia. Defendants have moved to dismiss the complaint, or alternatively for summary judgment. Plaintiffs filed a cross-motion for summary judgment. After giving consideration to the filings and oral arguments of counsel, the relevant law, and for the reasons more fully set forth below, the court DENIES defendants' motion and GRANTS plaintiffs' cross-motion.

Today's opinion marks one modest step in recognition of sentiments expressed by the Supreme Court more than forty years ago. Education is the "very foundation of good citizenship. . . . [I]t is a principal instrument in awakening the child to cultural values . . . and in helping him to adjust normally to his environment. . . . [I]t is doubtful that any child may reasonably be expected to succeed in life if he is denied [this] opportunity." *Brown v. Board of Education,* 347 U.S. 483, 493, 74 S.Ct. 686, 690, 98 L.Ed. 873 (1954).

## I. RELIEF

Plaintiffs are entitled to declaratory and injunctive relief. The court hereby finds that defendants have violated 42 U.S.C. §§ 11432(e)(3), (8) & (9) by failing to address educational needs of homeless children in a timely fashion. The court further finds that defendants have violated 42 U.S.C. §§ 11432(e)(1)(G) & (9) by failing to provide homeless children with access to adequate transportation to and from school.

The original complaint requested somewhat different injunctive relief than did plaintiffs' motion for summary judgment.[1]

---

1. Plaintiffs' original complaint sought the following declaratory relief, along with corresponding injunctive relief: (a) That the District of Columbia unlawfully failed to implement a "best interest" standard in making school placement decisions for homeless children, and unlawfully failed to give consideration to parents' requests in that determination. (b) That the District unlawfully failed to ensure transportation for home-

less children so that they may attend schools selected in accordance with their best interest. (c) That the District unlawfully failed to ensure access by homeless children to comparable educational services and school meal programs. These charges fall under 42 U.S.C. § 11432(e)(3), (5), (7), (8), (9), as well as § 11431(1), (2) and § 11432(c)(2), (4). Plaintiffs' more refined version of the relief they seek, as set forth in their

The relief sought in the summary judgment motion is more precisely delineated, although expressed in both a broad and narrow form. First, the broader version: Plaintiffs ask that the court require the District of Columbia: (1) to place each homeless child or youth in the school that is in his or her best interest to attend; and (2) to address transportation problems with respect to the education of homeless children and homeless youths, and review and revise transportation policies that act as barriers to the enrollment of homeless children in the schools that are in their best interest to attend. Plaintiffs then narrow their general requests, and ask that the following specific injunctive remedies be imposed: (1) Defendants must identify homeless children at the time they first report to the intake center, and arrange for appropriate educational services at that time; and (2) Defendants must implement a bus service dedicated to the transportation of homeless children to and from school.[2]

The court today has granted plaintiffs' motion, and responded to selected elements of the relief sought therein. Plaintiffs shall be deemed to have adopted their current prayer for relief, in an amalgam of its broad and narrow form, as a proxy for that which appeared in their original pleading. The relief granted today is dispositive with respect to the issues raised in the complaint.

Injunctive relief shall be structured as follows: First, the District must identify homeless children at the time they first arrive at an intake center, and refer these children within 72 hours for requisite educational services, including transportation. Second, the District must offer bus tokens to all homeless children who travel more than 1.5 miles to attend primary or secondary school; offer tokens to a homeless parent or other designated adult escort who accompanies a homeless child to or from school; and eliminate any delays occasioned by once-a-week distribution of tokens at homeless shelters. Alternatively, the District may, if it prefers, provide equivalent transportation services

through the medium of a dedicated bus system in lieu of public transit. Details of these directives are elaborated in Parts VI and VII below.

## II. LEGAL STANDARD

Because the parties have submitted evidence outside of the complaint, the court will treat defendants' motion as one for summary judgment pursuant to Fed.R.Civ.P. 56, rather than for dismissal under Fed.R.Civ.P. 12(b)(6). Summary judgment is appropriate where there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986). Inferences drawn from the facts must be viewed in the light most favorable to the party opposing the motion. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970). If summary judgment is to be denied, there must be evidence on which the jury could reasonably find for the non-movant. *Anderson v. Liberty Lobby*, 477 U.S. 242, 252, 106 S.Ct. 2505, 2512, 91 L.Ed.2d 202 (1986). If the non-movant "fails to make a showing sufficient to establish the existence of an element essential to [the non-movant's] case, and on which [the non-movant] will bear the burden of proof at trial," summary judgment may be granted. *Celotex*, 477 U.S. at 322, 106 S.Ct. at 2552.

## III. BACKGROUND

Plaintiffs in this case are a group of homeless mothers, as legal guardians for their minor school-aged children, and the National Law Center on Homelessness and Poverty. Due to the changing population of the homeless in the District of Columbia, the list of plaintiffs has varied; families who are no longer homeless have withdrawn from this action, and several recently homeless families have joined as plaintiffs. Defendants are the District of Columbia, the Mayor, the District

summary judgment motion, is limited to § 11432(e)(3), (8), (9), but adds § 11432(e)(1)(G).

**2.** At oral argument, plaintiffs acknowledged significant obstacles to a dedicated bus system, and

indicated that effective and timely access to public transportation would be an acceptable alternative.

of Columbia Public Schools, and the Superintendent of Schools (collectively, the "District").

On April 22, 1992, plaintiffs brought this action against the District under 42 U.S.C. § 1983 seeking declaratory and injunctive relief. Plaintiffs maintained that the District was in violation of the Stewart B. McKinney Homeless Assistance Act, 42 U.S.C. § 11301 *et seq.* (1988 & Supp. IV 1992) ("McKinney Act" or the "Act"). The District moved to dismiss the complaint on the grounds that there was no right of action to enforce the McKinney Act under 42 U.S.C. § 1983.[3] On June 9, 1992, this court granted defendants' motion. *Lampkin v. District of Columbia,* No. 92–0910, 1992 WL 151813 (D.D.C. June 9, 1992). The District of Columbia Circuit reversed and remanded, concluding that the McKinney Act confers rights that are enforceable under section 1983.[4] *Lampkin v. District of Columbia,* 27 F.3d 605, 612 (D.C.Cir.), *cert. denied,* —— U.S. ——, 115 S.Ct. 578, 130 L.Ed.2d 493 (1994).

Plaintiffs claim two specific transgressions of the McKinney Act in support of their motion for summary judgment. First, the District purportedly fails to address the educational needs of homeless children until some significant time after they become homeless, in violation of 42 U.S.C. §§ 11432(e)(3), (8) & (9). Second, the District does not provide adequate transportation to and from school for homeless children, in violation of 42 U.S.C. §§ 11432(e)(1)(G) & (9).

Defendants counter that they are in compliance with the Act; they have policies and procedures that assure homeless students in the District access to free public education at schools determined to be in their "best interest"[5]; and the District provides greater transportation assistance to homeless students than to non-homeless students.

## IV. THE DISTRICT'S POLICIES AND PROCEDURES

The District's relevant policies and procedures that address the educational needs of homeless children are enumerated below. Where defendants expand upon or contradict plaintiffs' version of a particular procedure, the differences are noted; but none of these assorted factual disputes are material to the court's resolution of the legal issues.

1. A homeless family first applies for shelter at the District's Office of Emergency Shelter and Support Services ("OESSS"). At that time, an intake worker interviews the applicant and determines the number and ages of any children in the family. The applicant completes a screening questionnaire and is informed of any additional documents that must be obtained before shelter availability is finally determined.

2. The family is not immediately placed in a shelter, but is given a number on a waiting list. Once the number comes to the top of the list, the family returns to OESSS. Then, if the family is determined to be eligible for emergency shelter, it enters the first phase

---

3. Section 1983 provides, in part:
 Every person who, under color of any statute, ordinance, regulation, custom, or usage, of ... the District of Columbia, subjects or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof, to the deprivation of any rights, privileges, or immunities, secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

4. Plaintiffs' original complaint also alleged that the District had violated the Due Process clause of the Fifth Amendment. That portion of the complaint was dismissed and was not challenged on appeal.

5. Plaintiffs dispute that a "best interest" determination is made at the District's intake shelters

and, if it is made, that it is adequate. More generally, plaintiffs disclaim that the District's practices conform to its professed policies and procedures. These disputes would ordinarily preclude summary judgment for either party. However, because plaintiffs' motion is limited in the relief it seeks—i.e., providing educational services to homeless children on a more timely basis; and providing access to transportation for homeless children to and from school—it is not necessary to reach peripheral factual squabbles concerning conformity of actual practices with professed policies. As more fully set forth in Section IV of this opinion, the policies themselves are what is at issue. These policies can be addressed on summary judgment as a matter of law.

of the District's shelter system, the Center City Hotel. Defendants observe that the information on a family's application must be verified before the family can qualify for shelter services. Once the verification process is complete, the family enters Center City Hotel the very same day.

3. The Transitory Students Technical Assistance Branch ("TSTAB") is the designated homelessness liaison for the District of Columbia Public Schools. TSTAB does not assume responsibility for addressing the educational needs of homeless children until they have entered the Center City Hotel, or until TSTAB becomes aware that the children are living in "doubled-up" situations (i.e., a family living with another family because of financial problems such as loss of housing). Illustrative of the lead time before TSTAB assumes control: Six of the plaintiffs waited an average of six weeks prior to entry into the shelter system. At the time of oral argument on February 28, 1995, plaintiff Stevenson had been on the waiting list since October 31, 1994—a period of four months.

4. TSTAB does not have staff at OESSS and does not provide services there. Defendants note, however, that OESSS works with TSTAB and provides educational services for families within 24 hours of the time their eligibility is confirmed. For example, if a child is having a problem getting to school, TSTAB may be asked to provide bus tokens (see numbered paragraph 6 below). And if a child is having a problem with school admission, TSTAB will help the child obtain the necessary documents.

5. OESSS assists families in locating a temporary place to stay—e.g., with relatives—while waiting for their number to come up. But the District does not determine that a family is actually homeless and thus eligible for shelter and other services until the family's number reaches the top of the list and the family returns to OESSS for placement. Once in Center City Hotel, the family is interviewed to resolve educational issues in the "best interest" of their children.

6. The District does not provide school bus service, except for special education children. However, the District does offer transportation tokens for homeless children who have to travel more than 1.5 miles to school. Tokens are distributed at Central City Hotel on Tuesday. If a family enters the shelter after Tuesday, it normally will not receive tokens until the following Tuesday, although TSTAB will help obtain tokens on an interim basis if the family expresses a need. The District's usual policy is to distribute tokens only after the "best interest" determination is made at Center City. Accordingly, unless OESSS notifies TSTAB of a family's need, tokens will not be available at the intake center. In 1994, there were no such notifications by OESSS to TSTAB. Defendants assert that the reason for no notifications is that families did not express an interim need for tokens.[6]

7. On a discretionary basis, OESSS occasionally provides tokens direct to families who bring their children to the intake center and report difficulty in obtaining transportation to school. Under a limited pilot program funded by the Cafritz Foundation through June 1995, tokens are provided on a discretionary basis to some parents of homeless children, aged five to nine, so they need not travel to and from school alone, providing the parents demonstrate a financial need.

## V. THE McKINNEY ACT

The McKinney Act was passed in 1987 in response to "the critically urgent needs of the homeless," 42 U.S.C. § 11301(b)(2) (1988), including the proper education of their children. 42 U.S.C. §§ 11431–35 (Supp. IV 1992). The Act reflected broad congressional policy that "each State educational agency . . . assure that each child of a homeless individual and each homeless youth have access to a free, appropriate public education . . . [and that] homelessness alone . . . not be sufficient reason to separate students from the mainstream school environment." *Id.* § 11431. For purposes of the Act, the District of Columbia is considered to be a state,

---

**6.** Defendants' counsel admitted at oral argument that families are not told they may request inter-

im tokens.

42 U.S.C. § 11421(d) (1988), and by accepting federal funds, the District assumed the obligation to comply with the Act's requirements. 42 U.S.C. § 11432(c) (Supp. IV 1992).

Section 11432(e), captioned "State plan," contains the pertinent provisions for purposes of plaintiffs' summary judgment motion. Paragraph (1) describes in general terms the concerns that are to be addressed by the plan. In particular, subparagraph (G) requires the District to adopt procedures designed to "address problems with respect to the education of homeless children and homeless youths, including problems caused by ... transportation issues." *Id.* § 11432(e)(1)(G).

Paragraphs (3) through (9) are devoted to specific means by which educational, health and other needs of the homeless will be confronted. To cite the three provisions that are germane here, paragraphs (3), (8) and (9) read in relevant part as follows:

(3)(A) The local educational agency of each homeless child and each homeless youth shall either—

(i) continue the child's or youth's education in the school of origin—

(I) for the remainder of the academic year; or

(II) in any case in which a family becomes homeless between academic years, for the following academic year; or

(ii) enroll the child or youth in any school that nonhomeless students who live in the attendance area in which the child or youth is actually living are eligible to attend;

whichever is in the child's best interest or the youth's best interest.

. . . . .

(8) Each local educational agency that receives assistance under this subchapter shall designate a homeless liaison to ensure that—

(A) homeless children and youth enroll and succeed in the schools of that agency, and

(B) homeless families, children and youth receive educational services for which they are eligible.

. . . . .

(9) Each State and local educational agency shall review and revise any policies that may act as barriers to the enrollment of homeless children and youth in schools selected in accordance with paragraph (3). In reviewing and revising such policies, consideration shall be given to issues concerning transportation.... Special attention shall be given to ensuring the enrollment and attendance of homeless children and youths who are not currently attending school.

All parties to this litigation agree that as a matter of policy, "best interest" determinations are not made and the remaining panoply of educational services are not provided until some time after a homeless family first reports to the intake center. All parties agree that as a matter of policy, neither dedicated transportation services nor assured access to public transportation is furnished to homeless children for travel to and from school. The question that the court must resolve is whether these acknowledged policies offend the McKinney Act, and if so, what can be done to fashion a remedy.

## VI. COMMENCEMENT OF EDUCATIONAL SERVICES TO HOMELESS CHILDREN

Plaintiffs declare that delay by the District in commencing educational services to homeless children violates the McKinney Act. The policy neglects a portion of the homeless population—those who have applied for emergency shelter and are on the waiting list for placement in a shelter. During the waiting period, the family remains homeless; yet the District has no mechanism for securing the children's attendance at school.

The pivotal inquiry is: at what point is a child considered to be homeless under the terms of the Act? Section 11302(a) defines "homeless." The pertinent provisions follow.

For purposes of this chapter, the term "homeless" or "homeless individual" or homeless person includes—

(1) an individual who lacks a fixed, regular, and adequate nighttime residence; and

(2) an individual who has a primary nighttime residence that is—

(A) a supervised publicly or privately operated shelter....

 Quite clearly, families who have entered the shelter system are homeless in accordance with § 11302(a)(2)(A). Equally clear is that families who have applied to OESSS and are on the waiting list are also homeless under § 11302(a)(1). They lack a fixed, regular and adequate nighttime residence. It is this latter group that the District, by its policy, ignores when providing educational services. Such a policy manifestly violates the McKinney Act.

 Under the Act, the District is required to assess which school is in each child's best interest to attend, giving due consideration to the parent's request. 42 U.S.C. § 11432(e)(3). This requirement is not limited to homeless children in shelters. The District's policy thus violates § 11432(e)(9). By not making a best interest determination or providing tokens to homeless families before they enter Center City Hotel, the District has erected "barriers to the enrollment of homeless children."

The District proffers three arguments in support of the proposition that its policy of commencing educational services at the time a family enters the shelter system complies with the McKinney Act. First, the District claims that the Act does not mandate that services be initiated when a family applies for shelter. Indeed, the Act is silent as to the exact date that services are to commence. Defendants, therefore, look to the legislative history. They cite various passages reflecting the importance of shelter placement and shelter services; and they conclude that educational services can only be evaluated in context of the overall objective of the entire statute. Furnishing educational services to homeless children is merely a portion of the services that Congress intended to offer.

By satisfying the overall goals—providing shelter and stability to homeless families— the District claims to have satisfied the various statutory components. This rather strained reading of the legislative history is both textually unsupported and illogical. The court has read the legislative history cited by the parties. Even if inclined to assign much weight to such congressional indulgences, the court detects nothing whatever to intimate that lawmakers relegated educational services to a subsidiary role in the statutory scheme. Failure to discharge the mandate to make adequate educational services accessible to homeless children must be analyzed on its own merits, not subordinated to a determination that shelter was paramount. Moreover, it is not self-evident that the District has fulfilled even the primary objective of the McKinney Act; nor may it be possible to do so without meeting each major sub-goal—especially one so integral as education. It is, in this court's view, a mockery to invoke legislative history in defense of a six-week or longer delay in offering homeless children an opportunity for proper schooling.

 Second, the District asserts that its local agency has reasonably interpreted the McKinney Act's silence as to when it should begin providing educational services. If the agency charged with administering an act has interpreted it in a reasonable manner, the court must defer to the agency's construction.

[I]f the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute.... [A] court may not substitute its own construction of a statutory provision for a reasonable interpretation made by the ... agency.

*Chevron v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 842–44, 104 S.Ct. 2778, 2782, 81 L.Ed.2d 694 (1984). But *Chevron* applies only to an agency's construction of a statute it is charged with administering. *Id.* at 842, 104 S.Ct. at 2781. Neither the District nor its Public Schools nor OESSS nor TSTAB has been charged by Congress with administering the McKinney Act—a federal statute which makes grants to states and imposes *quid pro quo* obligations upon state and local agencies. Both the grants

and the relevant authorized activities are under the auspices of the Secretary of Education. 42 U.S.C. § 11432(a). The state is charged with effectuating a plan to accomplish the objectives of the Act, but not with administering the Act itself.

■ Defendants' third argument is that an individual, before he or she is characterized as homeless, must meet certain income eligibility requirements. "A homeless individual shall be eligible for assistance under any program provided by this chapter, only if the individual complies with the income eligibility requirements otherwise applicable to such program." 42 U.S.C. § 11302(b)(1). Consequently, argues the District, there must first be a process of verifying the information in the family's application for shelter services. This is a misreading of the plain language of the statute. Only if there are income eligibility requirements *otherwise applicable* to a program, will participation be restricted. Defendants have offered no authority, and the court has found none, that establishes an income threshold for access by homeless children to a free public education.[7]

There are references to eligibility criteria for food programs and pre- and post-school care programs under 42 U.S.C. § 11432(e)(1)(D) & (E). There is ambiguous reference to "educational services for which [homeless families] are eligible" under § 11432(e)(8)(B). And there is more specific reference in § 11432(e)(5) to "educational services for which the child meets the eligibility criteria, such as compensatory educational programs for the disadvantaged, and educational programs for the handicapped and for students with limited English proficiency." But the express obligation that the District "ensure that homeless children and youth enroll ... in the schools" is unequivocal and unqualified. *Id.* § 11432(e)(8)(A).

■ The court finds that plaintiffs are entitled to injunctive relief. Specifically, the District must identify homeless children at the time they first arrive at the OESSS intake center, and refer these children to TSTAB within 72 hours for requisite educational services while they are on the waiting list and remain homeless. To the extent that the District unearths income criteria properly applied to educational services under the McKinney Act, and if implementing these criteria would prolong a 72-hour deadline, the District may move for reconsideration of the court's order as to the specific services involved. For those families currently on the waiting list for shelter, defendants shall identify their homeless children and refer them for educational services within two weeks of this date.

As plaintiffs have observed, accelerating the timetable for identification of homeless children should not be an overly burdensome task, nor is it outside the scope of procedures that the District presently has in place. Staff workers at OESSS already decide whether families on the waiting list are homeless in order to facilitate a double-up living arrangement until the families enter Center City Hotel. The District concedes that its eligibility investigations can be performed within 24 hours; families whose waiting list number comes up are interviewed and, if eligible, placed in a shelter the very same day. Delays might occasionally be prompted by the requirement for additional documentation, beyond what is supplied by the family at the initial intake interview. An extra 48 hours should be ample time to resolve such matters.

## VII. THE DISTRICT'S TRANSPORTATION POLICIES

The District's current policy is to distribute public transportation tokens to homeless children aged 5 to 18 who must travel more than 1.5 miles to school. Tokens are distributed at the shelter once each week. Plaintiffs maintain that the policy is inadequate on its face because it does not ensure that chil-

---

7. To qualify as homeless for purposes of the McKinney Act, defendants require that a family have financial resources of $100 or less, or net income below the amounts set forth in D.C.Code § 3–1008 (e.g., monthly income of $966.25 for a 2–person family). Neither plaintiffs nor defen- dants offer statistics on the proportion of families rejected; but it seems unlikely that a single-adult family applicant for shelter services would earn nearly $12,000 annually. Moreover, no authorization is cited for applying these cutoffs in the context of educational services under the Act.

dren can attend schools in their best interest to attend. Furthermore, plaintiffs contend that tokens alone will not satisfy the statutory mandate. Younger children cannot travel alone to school [8]; parents seeking or holding employment cannot accompany their children to school; and long commutes on public transportation have forced some children to transfer to less desirable schools closer to their shelter.

Defendants respond that the McKinney Act requires only that "[e]ach homeless child shall be provided services *comparable* to services offered to other students in the school ... including transportation services." 42 U.S.C. § 11432(e)(5) (emphasis added). Since the District does not offer transportation to non-homeless students, it need not, say defendants, offer transportation to the homeless. Plaintiffs reply that non-homeless children, assigned to schools within walking distance of their homes, do not require transportation; while the homeless, relocated to a shelter outside their school's area, cannot walk to school. In order to be "comparable," homeless and non-homeless must be put in nearly the same situation.

Other sections of the statute dispense with the comparability criterion. For example, the District must "address problems with respect to the education of homeless children and homeless youths, including problems caused by ... transportation issues." *Id.* § 11432(e)(1)(G). Also, the District must "review and revise any policies that may act as barriers to ... enrollment.... In reviewing and revising such policies, consideration shall be given to issues concerning transportation." *Id.* § 11432(e)(9).

■ The United States Department of Education has provided further evidence that "comparability" is an incomplete standard. In its May 1991 Memorandum to State Coordinators for Education of Homeless Children and Youth, the Department stated:

> [E]ven if "comparable" services are provided, lack of adequate transportation may still act as a barrier to school attendance by homeless children. Many neighborhood

schools, for instance, may offer no transportation services at all. Homeless children who attend that school and are temporarily housed some distance from it would find lack of transportation a barrier to attendance.

The Department's memorandum does not constitute a binding regulation nor a formal policy statement, but it is entitled to some weight in light of the Department's oversight authority under section 11432(a) of the Act.

Still, defendants present two possible reasons why they should be deemed to have complied with the relevant statutory provisions. First, the Department of Education memorandum notes explicitly that barriers to transportation are most troublesome for children housed *some distance* from their school. In fact, the District has addressed this specific problem and has instituted a program whereby tokens are made available to children who must travel at least 1.5 miles to school. To be sure, tokens may be less convenient than transportation on a dedicated bus, or walking to school; but it is certainly not incumbent upon the District to eradicate every annoyance faced by a homeless child.

Second, defendants point to 42 U.S.C. §§ 11431(3) & 11432(e)(1)(I) where, respectively, they are commanded not to "separate students from the mainstream school environment" and to "ensure that homeless children and homeless youths are not isolated or stigmatized." Offering dedicated bus service to homeless children, but not to most other students, could conceivably isolate and stigmatize. This argument cannot be casually dismissed, although similar services for special education students would mitigate any isolation or stigma.

The court is sympathetic to plaintiffs' appeal for better access to school transportation for the homeless. Still, a dedicated bus system may be ill-advised on several grounds. It would be a complex remedy, well beyond the expertise of this court (without significant outside assistance) to execute

---

8. Cafritz Foundation grants have supplied tokens to selected parents of children aged five to nine. However, there must be a showing of financial need, the grant expires in June 1995, and children above nine years old do not qualify even if too young to travel alone.

and monitor. Most importantly, the statutory infractions can be redressed without imposing a remedy quite so draconian.

■ Accordingly, the court orders the District to make transportation tokens available to all homeless children who have to travel more than 1.5 miles to attend primary or secondary school; to make tokens available to a homeless parent or other designated adult escort who accompanies a homeless child to or from school [9]; and to eliminate any delays occasioned by once-a-week distribution of tokens at the shelter.

■ These entitlements apply from the time a homeless child first arrives at the OESSS intake center. If the District wishes to establish a reasonable income eligibility standard to control availability of tokens, it may do so, subject to this limitation: The test may be used to revoke privileges, but it may not be used to delay initial distribution. In adopting an eligibility standard, the District should take into account that costs of a public transportation system are overwhelmingly fixed in nature; usage of the system by more patrons will likely have minimal impact on the overall cost structure.[10] The principal objectives of an income qualification should be to deter fraud and to imbue a sense of equity and fairness.

■ Notwithstanding significant obstacles to a dedicated bus service, the court will not foreclose that possible solution. If the District prefers dedicated service rather than assured access to public transportation, the District may inaugurate a busing system specifically for homeless children, or piggyback on the program currently open to special education students. Whichever alternative is selected, the goals enumerated above must be achieved. There must be free and adequate transportation for all homeless children who travel more than 1.5 miles to school.

## VIII. CONCLUSION

Homelessness has a profound influence on a child's ability to succeed at school. In a large number of cases, failure in school leads ineluctably to adult homelessness and poverty. To help break this cycle, Congress enacted the McKinney Act, directing that homeless children be provided a "free appropriate public education." Lamentably, Congressional goodwill was dissipated by murky statutory draftsmanship. As a result, the Act may not have the encompassing effect than its proponents had hoped. Courts respectful of separation of powers will only apply those provisions of the Act where legislative intent is reliably discernible.

The court's opinion today necessarily proceeds incrementally. By requiring the District to identify homeless children at the time they first arrive at an intake center, and by expanding the coverage of the District's program for providing transportation to and from school, the court takes an exiguous step toward a "free and appropriate public education."

The court is, of course, aware of the District's current budget difficulties. The court's role, however, is to *enforce existing law*, not to recast the statute to ameliorate the District's financial crisis.

A separate order shall issue this date.

9. Tokens for a parent or other escort are to be made available regardless of the child's age. The court is unwilling to make a legislative-type determination as to which children are too young to travel alone. This decision is best left to the parent. It will be up to the District to assure that the tokens are used for their intended purpose; i.e., to chaperon the children. Parents whose children are old enough to travel alone will not likely make purposeless bus trips merely to avail themselves of free tokens. Under the court's order, parents (not the court or a District of Columbia bureaucrat) will decide whether their children are capable of traveling to school by Metrobus on their own. Under the District's current policy, when the Cafritz grant expires, homeless children ages five to nine will just be given a token and told to take a Metrobus to school. And today, any homeless child age ten or above is expected to do the same. Clearly such a policy provides a barrier to education.

10. The court understands that the District may incur added costs to acquire tokens from the Washington Metropolitan Area Transit Authority ("WMATA"), a multistate compact which owns and operates the public transportation system for the Washington, D.C. metropolitan area. Of course, some portion of this expenditure will ultimately return to the city's coffers as it shares in WMATA's revenues.

## ORDER

This case comes before the court on defendants' motion to dismiss the complaint, or alternatively for summary judgment, and plaintiffs' cross-motion for summary judgment. After giving consideration to the filings and oral arguments of counsel, the relevant law, and for the reasons more fully set forth below in a memorandum opinion issued this date, the court DENIES defendants' motion and GRANTS plaintiffs' cross-motion.

Plaintiffs are entitled to declaratory and injunctive relief. The court hereby declares that defendants have violated 42 U.S.C. §§ 11432(e)(3), (8) & (9) by failing to address educational needs of homeless children in a timely fashion. The court further declares that defendants have violated 42 U.S.C. §§ 11432(e)(1)(G) & (9) by failing to provide homeless children with access to adequate transportation to and from school.

Injunctive relief shall be structured as follows: First, the District must identify homeless children at the time they first arrive at an intake center, and refer these children within 72 hours for requisite educational services, including transportation, while the children are on a waiting list for shelter. For those families currently on the waiting list for shelter, defendants shall identify their homeless children and refer them for educational services within two weeks of this date.

Second, the District must offer bus tokens to all homeless children who travel more than 1.5 miles to attend primary or secondary school; offer tokens to a homeless parent or other designated adult escort who accompanies a homeless child to or from school; and eliminate any delays occasioned by once-a-week distribution of tokens at homeless shelters. If the District wishes to establish a reasonable income eligibility standard to control availability of tokens, it may do so. However, the test may only be used to revoke privileges; it may not be used to delay initial distribution.

If the District prefers dedicated bus service rather than assured access to public transportation, the District may inaugurate a busing system specifically for homeless children, or piggyback on the program currently open to special education students. Whichever alternative is selected, there must be free and adequate transportation for homeless children who travel more than 1.5 miles to school.

SO ORDERED.