**Walter Edwin GILMORE, Jr., Plaintiff,**

v.

**INTERNATIONAL UNION OF OPERATING ENGINEERS, et al., Defendants.**

**Civ. A. No. 95–1152 (JR).**

United States District Court, District of Columbia.

July 26, 1995.

Steven M. Salky, Zuckerman, Spaeder, Goldstein, Taylor & Kolker, Washington, DC, for plaintiff.

Mark H. Rifkind, Slevin & Hart, Washington, DC, John R. Mooney, Edward M. Gleason, Jr., Beins, Axelrod, Osborne, Mooney & Green, P.C., Washington, DC, for defendants.

### *MEMORANDUM*

ROBERTSON, District Judge.

This matter came before me sitting as Motions Judge. After an evidentiary hearing on plaintiff's motion for preliminary injunction held on July 21, 1995, the case was transferred to me for all purposes.

Plaintiff Walter Gilmore alleges *inter alia* that he was hired as a lobby guard at the Washington, D.C. headquarters building of defendant International Union of Operating Engineers (IUOE) in October 1991; that he thereafter joined Service Employees International Union, AFL–CIO, CLC, Local 82 ("Local 82"); that he worked as a lobby guard on the 8 a.m. to 4 p.m. shift from October 1991 until May 4, 1994; that he was fired on May 4, 1994 after an altercation with IUOE's

president, defendant Frank Hanley; that, through Local 82 and pursuant to the provisions of the collective bargaining agreement between Local 82 and the IUOE, he filed a grievance with respect to his termination; that the grievance was referred for arbitration and that a hearing was conducted thereon; and that, on December 28, 1994, the arbitrator issued an award in his favor and ordered him reinstated. Plaintiff alleges that defendants IUOE and Hanley have refused to reinstate him to the job from which he was fired or to pay him or provide the other relief ordered by the arbitrator.

Gilmore's complaint is stated in four counts. Count I invokes the jurisdiction of this Court under Section 301 of the Labor Management Relations Act, 29 U.S.C. § 185, and seeks a judgment ordering IUOE to reinstate Gilmore to his former position as a lobby guard on the 8:00–4:00 weekday shift and to restore all of his seniority and benefits, together with back pay, attorneys fees, and other relief. Counts II and III recite claims under the Fair Labor Standards Act, 29 U.S.C. § 207, and the Minimum Wage Act Revision Act of 1992, 36 D.C.Code § 220.2, premised on the alleged failure of defendants IUOE and Hanley to pay time-and-a-half for overtime. Count IV asserts a violation of 36 D.C.Code § 101 *et seq.* with respect to the alleged failure of IUOE and Hanley to pay for Gilmore's accrued paid vacation time. No relief is sought in the complaint as to defendant Local 82.

The instant application for preliminary injunction, filed June 16, 1995, relates only to Count I and seeks only Gilmore's reinstatement to the 8:00–4:00 lobby guard position pending decision on the merits of this action.

Motions to dismiss were filed by all defendants on June 30, 1995, and are fully briefed. Local 82 moves to dismiss Count I of the complaint, asserting that it is the exclusive bargaining agent for its members and that, accordingly, plaintiff lacks standing to sue absent a showing of a breach by the union of its duty of fair representation or that the arbitration award plaintiff seeks to enforce was "a sham, inadequate, or unavailable." The IUOE and Hanley move to dismiss the entire complaint. They also argue that plaintiff lacks standing with respect to his reinstatement claim, and they argue further that plaintiff cannot demonstrate that the IUOE has failed to adhere to the terms of the arbitration award. IUOE then recycles those two arguments to oppose Gilmore's application for preliminary injunction, asserting that he is unlikely to succeed on the merits of his claim.

## FACTS

The following facts are established by testimony given at the July 21 hearing or otherwise by the record of this case:

In October 1991, Patrick O'Brien, IUOE's building engineer, approached plaintiff Walter Gilmore, told him the IUOE daytime lobby guard position was open, and asked if he was interested. Gilmore was, and, after an interview with defendant Hanley, was hired for the Monday–Friday 8–4 shift. The IUOE had two other building guard positions, one working weekday evenings and one working a combination of night and weekend hours. There was no rotation of shift assignments.

Gilmore joined Local 82, which represented about 10 employees of IUOE,[1] and worked at IUOE, apparently without incident, from October 1991 until May 4, 1994. Gilmore sometimes worked overtime, but he was under no obligation to do so. On May 4, 1994, after an argument with IUOE's president, defendant Hanley, Gilmore was fired. Gilmore filed a grievance protesting his discharge. The grievance was processed in accordance with the collective bargaining agreement between the IUOE and Local 82. An arbitration hearing was held on December 12, 1994.[2] The witnesses were Gilmore, Hanley and O'Brien. The arbitrator issued

---

1. Local 82's collective bargaining agreement covered "building service employees employed as general cleaners and utility cleaners." Apparently Gilmore and the other guards were considered "cleaners" for purposes of the CBA.

2. If there is a transcript of the December 12 arbitration hearing, it is not of record. Testimony taken on July 21, 1995 did not illuminate the question whether Gilmore's hours of work were the focus of testimony at the arbitration hearing.

his award on December 28, 1994, sustaining the grievance and ordering that Gilmore be "reinstated with full back pay (less any earnings or unemployment compensation), and restoration of seniority and benefits." Gilmore's uncontradicted testimony was that Carolyn Lewis, the Local 82 union representative who had represented Mr. Gilmore at the arbitration hearing, told him soon after the issuance of the award that the IUOE did not want him back and that the union would probably have to get a court injunction to force IUOE to take him back.

On January 9, 1995, Ms. Lewis wrote to Helen Morgan, IUOE's associate general counsel, reciting IUOE's "refusal to reinstate Mr. Gilmore to his previous job...." and giving notice that Local 82 would be "filing the necessary paperwork in District Court for an injunction to reinstate Mr. Gilmore." On January 13, 1995, Ms. Morgan replied that IUOE had not "refused to reinstate Mr. Gilmore" but that it was "actively exploring settlement in lieu of reinstatement...."

Further negotiations were conducted between the Local 82 and the IUOE. A cash offer made to Gilmore in lieu of continued employment was refused as inadequate. A meeting between Gilmore and Ms. Lewis took place on April 19, 1995.[3] There was no further communication between Mr. Gilmore and Ms. Lewis after the April 19 meeting.

On May 18, 1995, Ms. Morgan of IUOE advised Ms. Lewis of Local 82 by letter that "inasmuch as we have been unable to reach any satisfactory settlement," the IUOE was offering Gilmore "immediate reinstatement to a position as full-time guard (night/weekend shift)...." The work schedule for the offered position was Thursdays and Fridays from 10 p.m. to 6 a.m., Saturdays from 2 p.m. to 10 p.m., and Sundays from 6 a.m. to 2 p.m. and from 10 p.m. to 6 a.m.

On May 25, 1995, Gilmore's retained counsel advised IUOE by letter that Gilmore was now separately represented in connection with the arbitration award and all matters related to his prior employment with and his discharge from IUOE. This letter rejected the IUOE offer that Gilmore resume work on the night/weekend shift as a "unilateral and unjustified alteration of the arbitrator's order to reinstate Mr. Gilmore." The letter also withdrew any prior offers of compromise or settlement made on Gilmore's behalf by Local 82 and gave notice that, "if we cannot conclude a final settlement agreement by June 15, 1995, we intend to file a complaint seeking the confirmation of the arbitrator's award...."

On June 9, 1995, without notice to Gilmore or his counsel, IUOE's Ms. Morgan and Local 82's Ms. Lewis jointly telephoned the arbitrator. There is no transcript of that telephone conference. Ms. Morgan, who was present in Court at the July 21, 1995 hearing, was not called to testify about it. Ms. Lewis testified that the arbitrator was offered nothing new that he did not have at the December hearing and that the IUOE offer of the "graveyard" shift was not made known to the arbitrator. She said that the arbitrator asked whether the collective bargaining agreement provided for bidding on jobs according to seniority and whether employees had been transferred from one shift to another based on seniority. She apparently told the arbitrator (see tr. pp. 123–24) that there was no established usage or practice with respect to shift assignments. The arbitrator did not have the benefit of the testimony of Patrick O'Brien to the effect that Gilmore had been hired for the day shift, that shifts were not rotated, and that the day shift job was a position distinct from the other two lobby guard positions.

A letter memorializing the June 9 telephone conference was prepared by IUOE's Ms. Morgan under date of June 12, 1995 and was signed by the arbitrator on June 16, 1995. That letter stated, in relevant part:

> "In light of the Arbitrator's conclusion that the applicable collective bargaining agreement between the parties does not limit the Employer's discretion in assigning shifts within the unit, the Arbitrator clari-

---

3. Gilmore's version of this meeting conflicts with that of Ms. Lewis. Gilmore says that Ms. Lewis told him she had been told by "higher ups" that Local 82 could no longer represent him and that the matter had become "political." Ms. Lewis denied telling Gilmore that his case had become "political" or that she would not be able to "push his case."

fied his award by determining that the Employer's offer to reinstate Grievant to any full-time lobby guard position, regardless of shift, complies with the terms of his arbitration decision and award."

On the same day the arbitrator signed that "clarification," the general secretary-treasurer of IUOE executed an amended collective bargaining agreement with Local 82. A comparison of the amended agreement (Exhibit F to plaintiff's reply to IUOE's opposition to motion for a preliminary injunction) with the previous version (Exhibit B to plaintiff's application for preliminary injunction) reflects only two changes: The employer contribution to the health and welfare plan sponsored by IUOE was increased, for part-time employees, from $.89 per hour to $1.15 per hour; and one position, "the full time lobby desk person employed during business hours," was excluded from the bargaining unit recognized by IUOE.

Gilmore filed this action on June 16, 1995.

## DISCUSSION

Before reaching the question of Gilmore's entitlement to a preliminary injunction, it is necessary to consider the standing question and to decide whether or not this case presents a "labor dispute" within the meaning of the Norris–LaGuardia Act.

### A. *Standing*

 Local 82 argues that "it is virtually black letter law that individual union members lack standing under Section 301(a) of the Labor Management Relations Act ("LMRA"), 29 U.S.C. § 185(a),[4] to challenge an arbitration unless they can show breach by the union of its duty of fair representation or that the procedure was a sham, inadequate or unavailable." The IUOE argues to the same effect. Both parties rely on *Hines v. Anchor Motor Freight, Inc.*, 424 U.S. 554, 96 S.Ct. 1048, 47 L.Ed.2d 231 (1975). Plaintiffs in the *Hines* case were employees who sued their employer for breach of a collective bargaining agreement alleging that the decision of an arbitration committee, unfavorable

to them, was tainted by bad faith or misconduct on the part of the union. In such a case, "to prevail against either the company or the Union, petitioners must not only show that their discharge was contrary to the contract but must also carry the burden of demonstrating breach of duty by the Union." *Hines, supra*, at 569, 96 S.Ct. at 1059. The *Hines* opinion was translated into standing decisions by courts of appeals, many of whose decisions are collected in *Anderson v. Norfolk Western Railway Co.*, 773 F.2d 880, 882 (7th Cir.1985). The general rule, as recited by the *Anderson* court is that "individual employees have no standing to challenge an arbitration proceeding to which the Union and the employer were the sole parties."

Plaintiff seeks to distinguish this line of cases by pointing out that it emanates from employee challenges to arbitration awards (or union refusals to arbitrate), whereas this employee embraces the arbitration award and seeks only to enforce it. Plaintiff relies upon *F.W. Woolworth Co. v. Miscellaneous Warehousemen's Union, Local No. 781*, 629 F.2d 1204, 1208–13 (7th Cir.1980), *cert. denied*, 451 U.S. 937, 101 S.Ct. 2016, 68 L.Ed.2d 324 (1981), for the proposition that there is an exception to the general rule for employees seeking to uphold arbitration awards. In the *Woolworth* case, however, the union did not object to intervention by the employees. Here, the union not only objects to Gilmore's suit but has asserted its continuing status as exclusive bargaining agent. Moreover, Local 82's position here is that the arbitration award includes the June 16 clarification and thus that Gilmore is really a challenger like all the other employee-plaintiffs found to have lacked standing. The basic rationale of the *Hines* case and its progeny standing cases is that the "means chosen by the parties for settlement of their differences under a collective bargaining agreement" should be relied upon and given full play. *Hines, supra*, 424 U.S. at 561–63, 96 S.Ct. at 1054–55. When tested by that rationale, the distinction offered by plaintiff does not signify, and it has indeed been

---

4. LMRA § 301(a) vests the district courts with subject matter jurisdiction of "[s]uits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce ..., or between any such labor organizations...."

rejected by our Court of Appeals in *O'Hara v. District No. 1–PCD, MEBA,* 56 F.3d 1514, 1518–1519 (D.C.Cir.1995).

On the other hand, the record reflects several pungent matters that, at this stage of factual development, give rise to an inference that the resort by Local 82 and the IUOE to "clarification" was inadequate or sham. The fact that the Local 82 representative announced the union's intent to sue for enforcement of the arbitrator's award but then backed off after telling Gilmore there were "political" reasons why the union could not go forward would be enough, if Gilmore's testimony were ultimately credited by the finder of fact, to establish a bad faith breach of the duty of fair representation. Serious questions about Local 82's representation are also raised by the fact that the Local 82 representative joined a conference call for "clarification" of the arbitrator's award, without notice to or participation by Gilmore, during the pendency of negotiations between IUOE and Local 82 to amend their collective bargaining agreement to exclude from the bargaining unit the very job to which Gilmore sought reinstatement.

The detailed facts surrounding the amendment of Local 82's collective bargaining agreement have not been developed on this record but may turn out to be conclusive on the question of Local 82's performance of its duty of fair representation. It may be that, having embarked on negotiations for such amendment, Local 82 was no longer in a position to represent Gilmore at all. An agreement with IUOE to exclude "the full time lobby desk person employed during business hours" from the bargaining unit would put the union in the untenable position of advocating against its own agreement by pursuing Gilmore's claim and would "directly and significantly [frustrate Gilmore's] ability to vindicate [his] contractual rights under the collective bargaining agreement." *O'Hara v. District No. 1–PCD, MEBA, supra,* at 1521.

■ Defendants cite no decision binding upon this Court that stands for the proposition that Gilmore must have set forth his claim of breach of the duty of fair representation in a pleading in order to have standing at this stage. Plaintiff has adduced evidence and testimony that would support an amendment to state such a claim. Defendants' argument that the plaintiff lacks standing must therefore be rejected.

## B. *The Norris–LaGuardia Act*

■ The IUOE, in opposing the motion for preliminary injunction, invokes Section 7 of the Norris–LaGuardia Act, 29 U.S.C. § 101 *et seq.,* for the proposition that a preliminary injunction may not issue unless the factors set forth in that statute are satisfied. Indeed, the law in this Circuit is that "a District Court has no *jurisdiction* under the Norris–LaGuardia Act to issue a labor injunction without adhering to the explicit terms of the Act." *In Re District No. 1– Pacific Coast District, MEBA,* 723 F.2d 70, 76 (D.C.Cir.1983) (emphasis in original). The Norris–LaGuardia Act provides, in relevant part (29 U.S.C. § 107):

"No court of the United States shall have jurisdiction to issue a temporary or permanent injunction in any case involving or growing out of a labor dispute, as defined in this chapter, except after hearing the testimony of witnesses in open court (with opportunity for cross examination) in support of the allegations of a complaint made under oath, and testimony and opposition thereto, if offered, and except after findings of fact by the court, to the effect—

(a) that unlawful acts have been threatened and will be committed unless restrained or have been committed and will be continued unless restrained....

(b) that substantial and irreparable injury to complainants property will follow;

(c) that as to each item of relief granted greater injury will be inflicted upon complainant by the denial of relief that will be inflicted upon defendants by the granting of relief;

(d) that complainant has no adequate remedy at law; and

(e) that the public officers charged with the duty to protect complainant's property are unable or unwilling to furnish adequate protection.

■ Plaintiffs seek to distinguish Chief Judge Edwards' opinion in the *MEBA* case,

as they sought to distinguish the standing cases, on the ground that *MEBA* involved a motion to enjoin an arbitration between parties to a collective bargaining agreement whereas this case seeks enforcement of an award. The argument, which goes on to assert that there is no "labor dispute" here because the "labor dispute" ended with the arbitration award, is essentially the same one that was rejected by the Court of Appeals in *O'Hara v. District No. 1–PCD, MEBA, supra*, at 1519. It is clear that a district court must comply with the provisions of the Norris–LaGuardia Act before issuing an injunction and enforcing an arbitration award *arising out of* a "labor dispute." *See District 17 United Mine Workers of America v. Apogee Coal Company*, 13 F.3d 134 (4th Cir.1993); *District 17, United Mine Workers v. A & M Trucking, Inc.*, 991 F.2d 108 (4th Cir.1993).

### C. *Elements of Preliminary Injunctive Relief*

■ The Norris–LaGuardia Act's test for a preliminary injunction and the more familiar four-part test laid down by *e.g., Washington Metropolitan Area Transit Commission v. Holiday Tours, Inc.*, 559 F.2d 841, 842–44 (D.C.Cir.1977), are not co-extensive. *See, Apogee Coal Co., supra*, 13 F.3d at 137.

Plaintiff's argument for preliminary relief focuses on the traditional four-part test and argues that, under that test, the four factors "must be viewed as a continuum—more of one factor compensating for less of another," *quoting Petties v. District of Columbia*, 881 F.Supp. 63, 65 (D.D.C.1995). But plaintiff does not cite, nor has our research disclosed, any case that applies that "continuum" concept to the standards established by the Norris–LaGuardia Act. Indeed, the element on which plaintiff places most of his emphasis, likelihood of success on the merits, cannot be "balanced" under the Norris–LaGuardia test because it does not even appear on the list of findings that must be made to support an injunction and a labor dispute under the Norris–LaGuardia Act.

■ The element of irreparable harm is present in both tests, and on this element plaintiff has not sustained his burden. Plaintiff's loss of income from any wrongful denial of the reinstatement ordered by the arbitrator is compensable by way of a back pay award. If IUOE prevails on its position, articulated at oral argument, that any liability for back pay ceased at the latest on May 18, 1995, when it offered Gilmore employment on the graveyard shift, Gilmore could seek a remedy from the union for subsequent lost pay under the rubric of an action for breach of the duty of representation. And, while it is doubtful that Gilmore had the duty to mitigate his loss of *income* by accepting the IUOE's offer of a job on the graveyard shift, he clearly has been and is in a position, by taking that unwelcome job and improving his financial situation, to relieve the emotional distress to which he testified on July 21.

In view of the absence of irreparable injury, it is unnecessary to review and make findings on the other elements required by the Norris–LaGuardia Act or by the *Holiday Tours* case. The motion for preliminary injunction cannot be granted.

### D. *Future proceedings.*

■ In the *Apogee Coal* case, *supra*, the Fourth Circuit vacated a preliminary injunction issued by a district court to enforce a labor arbitration award and then took the occasion to comment that the process through which the litigation had thus far advanced—motions for preliminary relief, evidentiary hearings, and then an appeal—were "inimical to the goals of arbitration." 13 F.3d at 138. While conceding that cases may come before the district court that require discovery and more prolonged consideration, *id.* n. 5, the *Apogee Coal* opinion makes the point that "typically, district courts should establish an expedited schedule for consideration of petitions to enforce or set aside arbitration awards...." *Id.* n. 5. The point is taken, and it is applicable to this case, or at least to the reinstatement issue.

The evidence taken at the July 21 hearing and otherwise of record is compelling on the question of what job Gilmore was hired to do and what job he was fired from: It appears to be undisputed that the job he was offered in 1991 was the weekday, daytime job, that

shifts were not rotated, and that the lobby guard jobs were not fungible. The job Gilmore was offered on May 18, 1995, was not the general job of a building guard assigned to the graveyard shift for the time being, but rather "a position as full-time guard (night/weekend shift)," with the further specification that "the work schedule for the position is Thursdays and Fridays from 10:00 p.m. to 6:00 a.m., Saturdays from 2:00 p.m. to 10:00 p.m., and Sundays from 6:00 a.m. to 2:00 p.m. and 10:00 p.m. to 6:00 a.m., for a total of 40 hours." And the job that Local 82 and the IUOE have apparently agreed to exclude from the bargaining unit is not the job of just any lobby guard, but rather "the full time lobby desk person employed during business hours." It was that job—"full time lobby desk person employed during business hours"—from which Gilmore was fired. The natural reading of the arbitrator's order that "grievant is to be reinstated" is that he be reinstated to the position from which he was fired.

That natural reading does not end the inquiry, however. A number of legal and factual questions need to be resolved before a decision can be rendered on the merits of the reinstatement question. (1) Was Local 82 disqualified from purporting to represent Gilmore's interest in the "clarification" conference call with the arbitrator on June 9, 1995? In that connection, what are the true facts surrounding the renegotiation of the collective bargaining agreement? (2) In view of the arbitrator's finding that "there is nothing in the collective bargaining agreement which addresses employee ... work rules, or the standards to be applied in discipline or termination situations" so that he was "left with ... unrestricted authority," do Gilmore's rights under the December 28 award "depend entirely on what rights he had under the collective bargaining agreement" as in *O'Hara v. District No. 1–PCD, MEBA, supra,* at 1519. If so, could Gilmore have been "reinstated" to a position as a general cleaner or utility cleaner? (3) Can Gilmore be reinstated? *See Intern. Chemical Workers v. BASF Wyandotte Corp.,* 774 F.2d 43 (2d Cir.1985).

These questions are not meant to limit the issues that require resolution, but only to indicate to the parties what seem to me to be obstacles remaining before the merits of the reinstatement claim can be reached. After the parties meet and confer pursuant to Local 206, I will establish an expedited schedule for concluding the merits, at least of the reinstatement claim, and if possible of the back pay, overtime and vacation pay claims as well.

### *ORDER*

For reasons set forth in a memorandum issued today, it is this 26th day of July 1995 **ORDERED.**

1. That plaintiff's application for preliminary injunction [2] is **denied.**

2. That defendant Service Employees International Union AFL–CIO, CLC, Local 82's motion to dismiss [8] is **denied.**

3. That defendants International Union of Operating Engineers' and Frank Hanley's motion to dismiss the complaint and/or for a more definite statement [11] is **denied** as it relates to Count I of the Complaint and **taken under advisement** as to the remaining counts.

4. That counsel are directed to meet and confer pursuant to Local Rule 206, to develop an expedited schedule for resolution of the merits at least of Count I, and to file their Rule 206(d) report no later than August 2, 1995.