Nikita **PETTIES**, et al., Plaintiffs,

v.

**DISTRICT OF COLUMBIA,**
et al., Defendants.

**Civ. A. No. 95–0148 (PLF).**

United States District Court,
District of Columbia.

April 4, 1995.

**64**

Beth Goodman, Tanya A. Harvey, Washington, DC, for plaintiffs.

Karen Buck, Office of the Corp. Counsel, Washington, DC, for defendants.

## OPINION

FRIEDMAN, District Judge.

### I. BACKGROUND

This matter came before the Court on the plaintiffs' motions for class certification and for preliminary injunction. Plaintiffs, minor students eligible for special education and their parents, sought to certify a class of students with disabilities who are entitled to or receive special education instruction and services from the District of Columbia Public Schools ("DCPS").[1] After a hearing on March 17, 1995, the Court found that the prerequisites for class certification under Rule 23(a) and (b)(2), Fed.R.Civ.P., had been met and issued an Order certifying a class defined as:

> all [DCPS] students currently placed in private special education schools or receiving special education and/or related services from a private third party provider, all [DCPS] students placed in public schools who currently are receiving related services from private providers, and all [DCPS] students who have been determined by an administrative decision or by agreement with the DCPS to be eligible to receive services from private providers (including private placements).

For reasons stated in open court on March 17, 1995, the Court also granted plaintiffs'

motion for a preliminary injunction. The Court found, *inter alia,* that:

> Defendants have placed numerous DCPS students in private special education facilities pursuant to their obligation to provide an appropriate placement for these students. Similarly, defendants have entered into contracts or other agreement with private firms or other entities for the provision of special education related services to students attending public schools within the [DCPS] system. Defendants are required by law to maintain these students' placements and related services by paying the costs thereof.

> Defendants have not paid the costs of private special education placements or related services either fully or on a current or timely basis for at least the 1994–1995 school year. Consequently, defendants have violated the [Individuals With Disabilities Education Act] and other laws and regulations intended to ensure that DCPS students with special education needs receive a free, appropriate education.

> Unless defendants fully and immediately fund all DCPS students currently in private special education placements and/or receiving related services from private providers and, in addition, give adequate written assurances that such payments will be made on a current basis in the future, many, if not all of those students will have those placements and/or services terminated, and there is no indication that appropriate alternative placements will be available to meet the students' individual needs.

Preliminary Injunction at 1–2 (Mar. 17, 1995).

The Court concluded that the plaintiffs are suffering irreparable harm and ordered the defendants within fourteen days to pay all costs outstanding as of the date of the Court's Order, including costs of tuition for all private special education placements of DCPS students and all costs of all special education related services that private providers render to DCPS students pursuant to

---

1. The defendants in this case are the District of Columbia; Dr. Franklin L. Smith, the Superintendent of the District of Columbia Public Schools; and Dr. B. Garnett Pinkney, Director, Special Education Branch, The Logan School.

contracts or other agreements with the DCPS. The Court also required defendants to give written assurances that they will make future payments on a current basis and to report to the Court regarding their compliance with the Court's Order. This Opinion confirms the Court's oral ruling.

## II. THE INDIVIDUALS WITH DISABILITIES EDUCATION ACT

The main purpose of the Individuals With Disabilities Education Act ("IDEA") is to assure that children with disabilities have available to them a free, appropriate public education that addresses their unique needs. *See* 20 U.S.C. §§ 1400 *et seq.* The IDEA's principal means of ensuring that this goal is met is the "individualized education program" ("IEP") that the IDEA mandates for each disabled child. Each child's parents and teachers, as well as other professionals, are to develop an IEP that sets forth the required instruction and services designed to meet the child's unique needs, and the school system must propose an appropriate placement that meets the child's needs as set forth in the IEP. 20 U.S.C. § 1401(20); 34 C.F.R. §§ 300.340–300.350. Where an appropriate public placement is unavailable to meet the child's needs, the school system must provide an appropriate private placement or make available additional related services provided by private organizations to supplement a public placement. 34 C.F.R. §§ 300.400–300.403.

Once a placement has been made, agreed to, or determined to be appropriate after an administrative hearing, a school system proposing to change the educational placement of a student in special education must provide written notice to the student's parents, including a full explanation of all procedural safeguards available to them, an explanation of why the school system proposes to take the action, and a description of any factors relevant to the school system's decision. 20 U.S.C. § 1415; 34 C.F.R. §§ 300.504, 300.505, 104.36. The parents have a right to a prior administrative hearing if they disagree with the school system's proposed action, and the school system may not change a student's placement without the parent's agreement pending the administrative decision. 20 U.S.C. § 1415.

Plaintiffs brought this suit because, they argue, defendants' failure to pay for private placements for disabled students who are currently placed or who have been determined eligible for private provider services violates the DCPS' statutory duty under the IDEA to continue to provide students who have disabilities with a free, appropriate education.

## III. PLAINTIFFS ARE ENTITLED TO INJUNCTIVE RELIEF

To obtain injunctive relief, the plaintiffs must establish that (1) there is a substantial likelihood that they will succeed on the merits of the case, (2) irreparable harm would occur absent such an injunction, (3) an injunction would not substantially harm the rights of the defendants, and (4) an injunction would be in the public interest or at least not be adverse to the public interest. *Sea Containers Ltd. v. Stena AB*, 890 F.2d 1205, 1208 (D.C.Cir.1989); *Washington Metro. Area Transit Comm'n v. Holiday Tours, Inc.*, 559 F.2d 841, 842–44 (D.C.Cir.1977). Under *Holiday Tours*, the factors must be viewed as a continuum—more of one factor compensating for less of another. The necessary level or degree of likelihood of success will vary according to the court's assessment of the other factors; when the other three factors strongly favor interim relief, a court may grant injunctive relief when the moving party has merely made out a "substantial" case on the merits. *Washington Metro. Area Transit Comm'n v. Holiday Tours, Inc.*, 559 F.2d at 843.

### A. Likelihood of Success on the Merits

The certified class is made up of special education students in three different situations: those who have been placed in private schools or who are receiving special education services from a third party provider, those who have been placed in public schools but are receiving related services such as occupational or speech therapy from private providers, and those who have been determined by an administrative decision or

by agreement with the DCPS to be eligible to receive private placement or related services but have not yet been placed or received services. It is estimated that there are approximately 700–800 DCPS students who have been placed in approximately 60 private schools in the Washington Metropolitan area, 100–200 students in public schools who currently are receiving related services from private providers and under 200 students in the class who have been determined by administrative decision or by agreement to be eligible to receive special education services but have not yet received them.

By way of example, 44 students have been placed in the Chelsea School in Silver Spring, Maryland, 39 students in the Kingsbury Day School, and 10 students in the National Child Research Center ("NCRC"). Declaration of William F. Patterson ("Patterson Decl.") at ¶ 6; Supplemental Declaration of Marlene S. Gustafson ("Gustafson Supp.Decl.") at ¶ 2; Declaration of Janet L. Wintrol ("Wintrol Decl.") at ¶ 3. In each case, the DCPS has not paid the fees owed in full or in a timely fashion, and in each case the schools are so financially strapped as a result of the inaction of the DCPS that they are threatening to displace the students and not to take any more DCPS students. As stated by Ms. Wintrol, the DCPS' practice of late payments "drains the resources of NCRC, and will certainly put us in a financial bind by the end of the school year if not corrected.... It appears at this time that the only viable option may be to cease providing services to DCPS students after this semester." Wintrol Decl. at ¶¶ 7–8. Ms. Gustafson stated that the late payments by the DCPS have caused the Kingsbury Day School to have inadequate funds to operate the school. Declaration of Marlene S. Gustafson ("Gustafson Decl.") at ¶ 15; Gustafson Supp.Decl. at ¶ 3. Unless the school receives timely payments the school may require parents to pay their childrens' tuitions or may return DCPS students to the DCPS. Gustafson Decl. at ¶¶ 16–17; Gustafson Supp.Decl. at ¶ 4; *see also* Patterson Decl. at ¶¶ 10, 11, 21, 37.

Defendants acknowledge that the plaintiffs and those in the class they represent are entitled to receive the services guaranteed by the IDEA and that the DCPS is required by statute to pay for those services. Consequently, there is no dispute regarding the propriety of the continued placements and the provision of private related services to class members. Defendants also concede that the DCPS has at best been making partial and late payments and has not made all payments currently due. Finally, plaintiffs have made more than an ample showing that the DCPS is delinquent in its payments for placements and related services guaranteed by the IDEA and has not paid increased tuitions for placements or full fees for related services.[2]

The IDEA prohibits the DCPS from making unilateral changes in placements or provision of related services by failing to pay timely or fully. Failing to make payments in whole or in part or cutting off funds for special education programs amounts to a unilateral change in students' placements, which is prohibited by the IDEA. *Zvi D. By Shirley D. v. Ambach,* 694 F.2d 904, 906 (2d Cir.1982). As plaintiffs' declarations demonstrate, many providers of services have indicated that the DCPS' payment practices will lead them to discontinue existing placements, to refuse to accept further placements of DCPS students for the current and the 1995–96 school years, or to discontinue providing services to them. *See, e.g.,* Patterson Decl. at ¶ 37; Declaration of Alan C. Korz ("Korz Decl.") at ¶ 9; Declaration of Shirley Wade ("Wade Decl.") at ¶ 8. Thus, continued late and partial payments of tuitions and for related services by the DCPS will lead to unilateral changes in students' placements. In these circumstances, there is no question that the plaintiffs have a strong likelihood—indeed, a virtual certainty—of success on the merits. Simply put, "the right ... to receive

---

2. *See, e.g.,* Letter from Timothy E. Hall, Board of Governors of The Chelsea School, to Elvamarie Zelaya (January 17, 1995), Exhibit A to Plaintiffs' Motion For Preliminary Injunction; Patterson Decl. at ¶¶ 6–23; Gustafson Decl. at ¶¶ 8, 12; Declaration of J. Kevin Fee, Vice President of Woods Services, at ¶¶ 5–9; Declaration of Lynne Israel, Owner and Director of Lynne Israel and Associates, Inc., ("Israel Decl.") at ¶¶ 5–6; Declaration of Karen Howze ("Howze Decl.") at ¶ 14.

a free appropriate education … cannot be constricted by monetary limitations." *Cox v. Brown,* 498 F.Supp. 823, 830 (D.D.C.1980); *see also Fisher v. District of Columbia,* 828 F.Supp. 87, 88–89 (D.D.C.1993).

### B. Irreparable Harm
#### 1. The Evidence Produced Is Overwhelming

■ Because the likelihood of success on the merits is so clear, the central question in this case is whether the class members will be irreparably harmed in the absence of an injunction directing the DCPS to pay its current outstanding bills and to provide assurances that it will pay its bills fully and in a timely fashion in the future. The Court finds that plaintiffs have demonstrated several types of irreparable harm that will result if the DCPS is allowed to continue its current payment practices.

First, defendants' actions have denied services to students who have been identified as requiring private placements or related services and have been determined by administrative decision or agreement to be entitled to them but have not yet received them. Private service providers have stated that because of the DCPS' payment practices they will not take on additional students from the DCPS or provide services to DCPS students. *See, e.g.,* Korz Decl. at ¶¶ 9, 11, 12. Private schools and service providers are declining to provide further service to DCPS students because they cannot be assured that the DCPS will fully pay them on time. Consequently, it has become increasingly difficult, if not impossible, for parents to obtain private placements or services for students recently found to require such placements or services. *See* Israel Decl. at ¶¶ 10–11; Declaration of Donna Wulkan ("Wulkan Decl.") at ¶¶ 3–5; Declaration of Margaret A. Kohn ("Kohn Decl.") at ¶¶ 3–5; Declaration of Lorraine Friedman ("Friedman Decl.") at ¶¶ 5–7; *see also* Howze Decl. at ¶ 8; Declaration of Justine Hranicky Muhammad ("Muhammad Decl.") at ¶¶ 6–9.

For example, Philippe Dupont, the Educational Director of the Pathways School, has stated that the school has a space available for an appropriate DCPS applicant but, be-cause the school has had to implement a policy requiring prepayment to account for the DCPS' payment problems and the student's parent is unable to prepay, the student has not been permitted to start attending Pathways. Declaration of Philippe J. Dupont ("Dupont Decl.") at ¶ 10. Linda Nolan, Director of the Washington Developmental Center, which provides occupational and physical therapy services to 24 DCPS students with disabilities, has stated that the organization recently refused to accept several additional DCPS students for services because of the DCPS' late and partial payments. Declaration of Linda Nolan ("Nolan Decl.") at ¶¶ 5–7, 9. Ms. Nolan further stated that she knows of no other occupational therapists who could provide the necessary services to these children. *Id.* at ¶¶ 3, 8, 9.

Second, the DCPS' payment practices have led to the termination or interruption of placements of or related services to numerous DCPS students. For example, because of the DCPS' nonpayment, Lynne Israel and Associates, Inc., which provides occupational therapy services to twelve DCPS students, had to interrupt services to those students in January. Israel Decl. at ¶ 7. Justine Muhammad, the mother of a DCPS student, stated that a hearing officer ordered the DCPS to provide her daughter with certain related services including speech and language therapy but that she was able to obtain the therapy for her daughter for only a brief period of time because of the DCPS' payment policy; when the therapist found out that the DCPS was not paying therapists fully or on time she terminated the service. Muhammad Decl. at ¶¶ 6–7; *see also* Howze Decl. at ¶ 8.

Third, the DCPS' payment practices are causing the imminent interruption or termination of services. William Patterson, the Head of School of the Chelsea School, stated that Chelsea will not admit any new DCPS students nor will Chelsea re-enroll any of the current DCPS students for the 1995–96 school year unless their tuition is paid in advance. Patterson Decl. at ¶ 37; Supplemental Declaration of William F. Patterson ("Patterson Supp.Decl.") at ¶ 6. In addition, he noted that the tuition for all Chelsea

students has been increased for the 1995–96 school year, but that the DCPS has informed Chelsea that it will not honor any tuition increase for the 1995–96 school year. Patterson Supp.Decl. at ¶¶ 2, 5, 6. Consequently, until the DCPS changes its position on paying the increased tuition and paying it in advance, Chelsea will not re-enroll DCPS students for the 1995–96 school year unless the students' parents or guardians pre-pay the full tuition. *Id.* at ¶¶ 6, 8, 10.

Numerous other institutions have indicated that they were not likely to accept further placements or provide related services to DCPS students because of the DCPS' practices of under-payment and late-payment. The Director of the Kingsbury Day School, which provides services to 39 DCPS students, stated that the school "cannot continue to operate as a financially viable organization if DCPS fails to pay or delays payment on properly submitted invoices." Gustafson Supp.Decl. at ¶ 3. Alan Korz, the Executive Director of the Episcopal Center for Children, which services six DCPS students, stated that in light of the DCPS's payment practices, the Episcopal Center is not accepting applications for new DCPS-funded students for the 1995–96 academic year; "it appears that the only viable option may be to cease providing services to DCPS students at the conclusion of the school year." Korz Decl. at ¶ 9. Shirley Wade, the Director of the District of Columbia Association of Retarded Citizens, which provides several services to DCPS students including vocational skills training, stated that if the DCPS' failure to make timely or complete payments continues, the organization may deny further services to current DCPS students and decline to accept any more DCPS students in the future. Wade Decl. at ¶ 8.[3]

Fourth, plaintiffs have demonstrated to the Court that the DCPS' payment practices are causing ongoing psychological injury to many of the students who make up the plaintiff class. A number of parents have stated that their childrens' behavior at home and performance in school have deteriorated with the uncertainty over whether they will be able to stay in school. *See* Declaration of Linda McQueen ("McQueen Decl.") at ¶ 7; Declaration of Donna Tracy ("Tracy Decl.") at ¶ 6; Declaration of Paulis Waber at ¶ 16. Other parents have emphasized the importance of their childrens' current placements to their emotional well-being and the significant setbacks that the children would suffer if the placements were ended. *See* Myers Decl. at ¶¶ 3–12; Martin Decl. at ¶¶ 5, 9; Queen Decl. at ¶¶ 9, 16. Still others have reported that there have been physical manifestations caused by the emotional stress and anxiety. McQueen Decl. at ¶ 7; Tracy Decl. at ¶ 6.[4]

These students are children of tender ages who are already physically or emotionally disabled. They therefore are less able than most to cope with mental and emotional stress. Many clearly are unable to cope with the stress and anxiety from the threatened termination or interruption of their education and placements. They face ever increasing mental, emotional and physical harm if these placements or services are terminated or if they are interrupted for any appreciable period of time.

2. Defendants' Arguments Are Unavailing

Defendants argue that the DCPS has now paid most of the disputed outstanding bills for student placements and related services that plaintiffs have brought to defendants' attention. Defendants further argue that no student has yet lost his or her placement because of the DCPS' payment policy. They

---

3. *See also* Declaration of Shari Gelman, President of The Maryland Association of Non-Public Special Education Facilities, ("Gelman Decl.") at ¶ 7; Declaration of Sharon Raimo, Director of the St. Coletta School, ("Raimo Decl.") at ¶ 4; Dupont Decl. at ¶¶ 8–9; Nolan Decl. at ¶ 10; Israel Decl. at ¶¶ 6, 10; Declaration of Carol Myers ("Myers Decl.") at ¶¶ 10–11; Declaration of Judy E. Martin ("Martin Decl.") at ¶ 7; Declaration of Rose L. Queen ("Queen Decl.") at ¶ 10; Howze Decl. at ¶¶ 12–13.

4. School officials experienced in dealing with disabled students have outlined the types of harms that students likely will suffer if deprived of an appropriate educational placement, including deterioration of their mental, emotional and physical well-being, increased involvement in delinquent activities and possibly substance abuse. *See* Korz Decl. at ¶ 13; Dupont Decl. at ¶ 13; Nolan Decl. at ¶ 11; Israel Decl. at ¶ 12; *see also* Wulkan Decl. at ¶ 12; Kohn Decl. at ¶ 11; Friedman Decl. at ¶ 11.

maintain that if a private provider no longer will accept a DCPS student or provide related services because the provider is unwilling to accept the DCPS' payment terms, the DCPS then will find alternative placements or services for the displaced students. Defendants therefore contend that the DCPS policy of late payments has not harmed, nor does it threaten to harm, class members.

The Court rejects defendants' arguments. That defendants have paid a number of bills for private placements and related services in the face of this litigation does not address the long-term or ongoing harm that plaintiffs have alleged and extensively documented. Defendants' current payment practices do not guarantee that the DCPS will in the future pay in full or on time; and there has been no indication that the DCPS' long-standing payment practices have changed except in a piecemeal fashion in response to litigation. There is no evidence that, even with respect to the few placements that defendants have now paid in part or in full, the DCPS has removed the threat of further late and partial payments that will likely lead to loss of placements or services, or that the current practices of the DCPS adequately deal with the emotional and mental stress caused by defendants.

The defendants cannot moot the claims of the entire class by mitigating the damages of some of the plaintiffs on a piecemeal basis after suit has been filed. *See Tonya K. by Diane K. v. Chicago Bd. of Educ.*, 551 F.Supp. 1107, 1112 (N.D.Ill.1982). Making partial payments in response to a lawsuit does not eliminate the consequences suffered by the plaintiffs from the uncertainties associated with the DCPS' payment practices; the harm to plaintiffs will continue unless the DCPS provides assurances that payments will be timely and fully made. Furthermore, because of the history of the payment practices of the DCPS and the District of Columbia's continuing financial woes, there is "a sufficient likelihood that [the class members] will again be wronged in a similar way" if relief is not granted. *Honig v. Doe*, 484 U.S. 305, 323, 108 S.Ct. 592, 604, 98 L.Ed.2d 686 (1988) (quoting *Los Angeles v. Lyons*, 461 U.S. 95, 111, 103 S.Ct. 1660, 1670, 75 L.Ed.2d

675 (1983)). Because defendants have established a routine of paying some past due bills once faced with litigation, plaintiffs have also demonstrated that any resulting claim they may have for relief is not moot because the conduct they complain of is "capable of repetition, yet evading review." *Id.* at 318, 108 S.Ct. at 601 (quoting *Murphy v. Hunt*, 455 U.S. 478, 482, 102 S.Ct. 1181, 1183, 71 L.Ed.2d 353 (1982)).

█ To show that irreparable harm will occur absent an injunction, the plaintiffs do not have to wait until the DCPS' payment practices inevitably result in a student's placement being terminated. The plaintiffs have demonstrated that once a termination has occurred, the harm is irremediable. Once a student loses his or her placement at a private educational provider, the spot at the institution will quickly be filled and there is no guarantee that room for the displaced student will soon become available there. *See, e.g.,* Patterson Supp.Decl. at ¶¶ 10, 11. Furthermore, it is unlikely that a student whose placement is terminated by one private institution will be able to find placement or services elsewhere. Declaration of Elizabeth Stoff, Educational Coordinator for the Dept. of Physical Medicine and Rehabilitation of Children's National Medical Center, ("Stoff Decl.") at ¶ 8.

Because of the DCPS' practices of making late and partial payments, schools that previously accepted DCPS students and organizations that have provided related services are unwilling to do so now. *See* Declaration of Edward Schultze, Executive Director of the Leary School, at ¶¶ 4–9; Patterson Decl. at ¶ 32; Gelman Decl. at ¶ 6; Raimo Decl. at ¶ 3; Wade Decl. at ¶ 8; Nolan Decl. at ¶ 8. At the same time that the range of programs within the DCPS for disabled students declines, the pool of private schools and providers willing to accept DCPS-funded students is steadily shrinking because of the DCPS' failure to pay for services in a timely or complete manner. Stoff Decl. at ¶¶ 4–7; Wulkan Decl. at ¶¶ 3–5, 7, 10–11; Kohn Decl. at ¶¶ 3–5, 7, 10; Friedman Decl. at ¶¶ 4–6.

Having considered the evidence and arguments of the parties, the Court concludes that the District's payment policy places

70

class members' access to a free, appropriate education in immediate jeopardy and is tantamount to a change of placement without the procedural safeguards provided by the IDEA. *See Cox v. Brown,* 498 F.Supp. at 827–30; *Fisher v. District of Columbia,* 828 F.Supp. at 88–90. There is a strong and very real threat that class members will be expelled from private institutions if the District of Columbia fails to pay its bills in a timely fashion. *Compare Cochran v. District of Columbia,* 660 F.Supp. 314, 316 (D.D.C. 1987) (no showing that plaintiff will suffer irreparable harm in the absence of an injunction because there was no evidence that school was threatening to expel the student for non-payment).

The Court also finds that, if allowed to continue, the payment practices of the DCPS will lead to private providers' refusal to continue offering services to DCPS students, which will in turn make it impossible for students who have had their placements or related services terminated to obtain the instruction and services to meet their unique needs. The decrease in available services is also hindering the ability to fulfill the needs of students who have been determined by an administrative decision or by agreement with the DCPS to be eligible to receive private placement or related services but have not yet been placed or received services. Finally, the Court finds that the uncertainty over the consequences of the DCPS' actions is exacting a psychological, emotional and physical toll on many of the students in the plaintiff class. Irreparable harm has been demonstrated clearly and dramatically. *See Cox v. Brown,* 498 F.Supp. at 829.

### C. The Public Interest

■ Defendants acknowledge their statutory obligation to pay for the class members' placements and services, but argue that the District of Columbia's dire financial situation prevents them from meeting that obligation promptly. They urge the Court to recognize that the District of Columbia's cash flow problems affect all District of Columbia services and argue that the Court should not selectively become a collection agency for one type of aggrieved party seeking payment from the District.

Unfortunately for the District, in this and numerous other situations now facing it, difficult financial constraints do not relieve the District of Columbia from its statutory obligations. *See Fisher v. District of Columbia,* 828 F.Supp. at 89–90; *Grace B. v. Lexington School Committee,* 762 F.Supp. 416, 420 (D.Mass.1991). Unless such relief is provided by the City Council or, in this case, the Congress, "[t]he court's role ... is to enforce existing law, not to recast the statute to ameliorate the District's financial crisis." *Lampkin v. District of Columbia,* 879 F.Supp. 116, 126 (D.D.C.1995) (RCL). The Individuals With Disabilities Education Act requires that the class members' placements be fully funded and that the District of Columbia provide the funding in a timely fashion to ensure that the students' placements or related services are not terminated or interrupted.

For the foregoing reasons, the Court has granted plaintiffs' motion for a preliminary injunction and ordered the District of Columbia to make timely payments for private placements and related services, to pay in full, and to assure that students placed in private schools by the DCPS and DCPS students receiving related services from private providers will have their placements or services fully paid on time. The Court is confident that with payment assured by the Court's Order, and recognizing that the Court has the power to hold the defendants in contempt if they do not comply, the private schools and service providers will not interrupt or terminate placements or services, and will continue to meet the needs of DCPS students who require such placements or services. Consistent with this Opinion, the Court entered a Preliminary Injunction on March 17, 1995.[5]

SO ORDERED.

---

5. Because the Court concludes that plaintiffs have established the necessary prerequisites un-

der the traditional test for injunctive relief, the Court need not determine the applicability of the "stay put" provision of the IDEA. 20 U.S.C. § 1415(e)(3).