**Nikita PETTIES, et al., Plaintiffs,**

**v.**

**The DISTRICT OF COLUMBIA, et al., Defendants.**

**No. CIV.A. 95–0148(PLF).**

United States District Court, District of Columbia.

Nov. 22, 2002.

Kelly Bagby, Jesse D. Stein, Lisae C. Jordan, University Legal Services, Bradford P. Johnson, Goodman & Johnson, Washington, DC, for Plaintiffs.

Daniel Rezneck, Office of the Corporation Counsel, Laurel Pyke Malson, Crowell & Moring, Washington, DC, for Defendants.

Elise T. Baach, Office of the Special Master, Washington, DC, Special Master.

*OPINION*

PAUL L. FRIEDMAN, District Judge.

This matter came before the Court for consideration of plaintiffs' emergency motion for a temporary restraining order. Defendants filed an opposition, and oral argument took place on November 12, 2002. At the conclusion of the hearing, the parties agreed that the Court should treat the motion as one for a preliminary injunction. The Court granted the motion for preliminary injunction by Order of November 14, 2002. This Opinion sets forth the reasons for that decision.

## I. BACKGROUND

### A. *A History of the Case*

Plaintiffs, special education students and their parents, filed this class action lawsuit seven years ago because the District of Columbia Public Schools ("DCPS") had consistently failed to pay the costs of special education placements or related services to private providers, either fully or on a current or timely basis as required under the Individuals With Disabilities Education Act ("IDEA"), 20 U.S.C. §§ 1400 *et seq.* As a result of this failure, many of the private providers threatened to terminate the students' placements. On March 17, 1995, the Court granted plaintiffs' motion for a preliminary injunction, finding that "unless defendants fully and immediately fund all DCPS students currently in private special education placements and/or receiving related services from private providers and, in addition, give adequate written assurances that such payments will be made on a current basis in the future, many, if not all of those students will have those placements and/or services terminated, and there is no indication that appropriate alternative placements will be available to meet the students' individual needs." *Petties v. District of Columbia,* 881 F.Supp. 63, 64

(D.D.C.1995) ("*Petties I* ").[1]

As the Court explained, the purpose of the IDEA is to ensure that children with disabilities have available to them a free and appropriate public education that addresses their unique needs. *Petties v. District of Columbia,* 881 F.Supp. at 65; see 20 U.S.C. §§ 1400 *et seq.* To ensure that this goal is met, the IDEA directs the child's parents, teachers and other professionals to develop an Individualized Education Program ("IEP") for each special education student that sets forth the required instructions and services designed to meet the particular child's unique needs. *See* 20 U.S.C. § 1414(d). Once the IEP is developed, the school system must provide an appropriate placement that meets those needs and, if an appropriate public placement is unavailable, the school system must provide an appropriate private placement or make available educational-related services provided by private organizations to supplement a public placement. *See* 20 U.S.C. § 1412(a)(10); 34 C.F.R. §§ 300.349, 300.400–402.

The Court concluded that DCPS's failure to pay providers, and the resulting risk to the children's placements, violated the IDEA and its implementing regulations. *See Petties v. District of Columbia,* 881 F.Supp. at 65. The Court expressly held that "the IDEA prohibits the DCPS from making unilateral changes in placements or provision of related services by failing to pay timely or fully. Failing to make payments in whole or in part or cutting off funds for special education programs amounts to a unilateral change in students' placement, which is prohibited by the IDEA." *Id.* at 66 (citing *Zvi D. By Shirley D. v. Ambach,* 694 F.2d 904, 906 (2d Cir. 1982)).

The Court then determined that declarations submitted by plaintiffs at that time demonstrated that DCPS's payment practices would lead many providers of services to discontinue existing placements, to refuse to accept further placements of District of Columbia children for the 1994–95 and the 1995–96 school years, or to discontinue providing services to the DCPS students all together. "Thus, continued late and partial payments of tuitions and for related services by the DCPS will lead to unilateral changes in students' placements." In these circumstances, there is no question that the plaintiffs have a strong likelihood—indeed, a virtual certainty—of success on the merits. Simply put, "the right ... to receive a free appropriate education ... cannot be constricted by monetary limitations." *Petties v. District of Columbia,* 881 F.Supp. at 66–67 (quoting *Cox v. Brown,* 498 F.Supp. 823, 830 (D.D.C.1980) and citing *Fisher v. District of Columbia,* 828 F.Supp. 87, 88–89 (D.D.C.1993)).

In addition to providing plaintiffs immediate injunctive relief, on June 29, 1995 the

---

1. That same day the Court certified a plaintiff class, defined as follows:

   all [DCPS] students currently placed in private special education schools or receiving special education and/or related services from a private third party provider, all [DCPS] students who currently are receiving related services from private providers, and all [DCPS] students who have been determined by an administrative decision or by agreement with the DCPS to be eligible to receive services from private providers (including private placements).

*Petties v. District of Columbia,* 881 F.Supp. at 64. On July 21, 1995, the Court modified the preliminary injunction and class certification specifically to include all DCPS students with disabilities whose private special education placements and/or related services are funded by the District of Columbia Department of Human Services. *See Petties v. District of Columbia,* 894 F.Supp. 465, 469 (D.D.C. 1995).

Court entered an order to ensure that DCPS's late or partial payment to private providers did not reoccur. The order required DCPS (1) to provide assurances to all private special education providers that payment would be made in full; (2) to pay all invoices in full within 30 calendar days of receipt or, if disputed, to notify providers in writing of the amount disputed and the specific reason for the dispute within 15 calendar days of receipt of the invoice; and (3) to provide the Court and plaintiffs' counsel with a monthly compliance report. *Petties v. District of Columbia*, No. 95–0148, Order ¶¶ 1–4 (D.D.C. June 29, 1995) ("Order of June 29, 1995"). The parties subsequently consented to a structured payment system, the Petties Automated Payment System ("PAPS"), which sets forth specific procedures and schedules for payments to private providers. *See Petties v. District of Columbia*, No. 95–0148, Order Modifying Automatic Payment System (D.D.C. Aug. 28, 1996). The Court thereafter entered orders supplementing the PAPS for each school year through the 2001–02 year.[2]

### B. *The Current Circumstances*

Now, seven years later, plaintiffs again seek injunctive relief because of DCPS's failure to make timely and full payments to private providers. Plaintiffs filed the instant motion seeking a mandatory injunction directing DCPS to make owed payments to two private providers who, unless they receive prompt payment for services already provided, represent that they will be forced to close their doors, leading to the immediate displacement of 151 special education students. In other words, seven

years of litigation and court supervision have not taught DCPS that it must pay providers for educational services pursuant to the IDEA and the substantive and procedural orders of this Court, and that it cannot risk students' placements in an attempt to change DCPS payment policies. Regrettably for the special education students of the District of Columbia, it appears to be "*deja vu* all over again."

Educational Transition Services ("ETS") and Rock Creek Academy ("Rock Creek") are educational facilities that provide special education services to DCPS students. ETS was designed to provide interim placements for students for whom permanent placements have not yet been determined. Rock Creek is a permanent placement provider. *See* Plaintiffs' Memorandum of Points and Authorities in Support of Motion for Temporary Restraining Order and Motion for Preliminary Injunction ("Pls.' Mem."), Ex. C, Declaration of Kelley Brock, Ph.D. ("Brock Decl.") ¶ 7. Both ETS and Rock Creek have operated from their inception under the framework established by the PAPS. *See* Pls.' Mem., Ex. A, Declaration of Richard K. Henning ("Henning Decl.") ¶ 2.

There are 151 DCPS students currently enrolled in ETS or Rock Creek who were placed with these providers pursuant to a DCPS hearing officer determination, a settlement agreement between DCPS and the student's parent, or an IEP. *See* Pls.' Mem. at 4; Brock Decl. ¶ 6. As the IDEA and the earlier opinions of the Court make plain, once there is an IEP in place, a hearing officer determination, or a place-

---

**2.** On September 5, 2002, the Court entered an order modifying the PAPS for September 2002. *See Petties v. District of Columbia*, No. 95–0148, Order Supplementing August 2, 2001 Order Modifying Automated Payment System (Setting Payment Schedule for September 2002) (D.D.C. Sept. 5, 2002). On October 11, 2002, the Court entered an order eliminating the PAPS, but the payment procedures currently in place retain the procedural safeguards of the original *Petties* orders. *See Petties v. District of Columbia*, No. 95–0148, Order of October 11, 2002 (D.D.C. October 11, 2002) ("Order of Oct. 11, 2002").

ment pursuant to a settlement agreement, there can be no change in placement without providing a student and his or her parents with the full panoply of due process rights established by Congress, including (unless the matter is otherwise consensually resolved) an administrative due process hearing. *See* 20 U.S.C. § 1415; *Petties v. District of Columbia,* 881 F.Supp. at 65.

Plaintiffs represent that in June 2002, ETS and Rock Creek submitted to DCPS their projected average billing amount for July and August 2002, and that DCPS filed timely disputes of these proposals on July 2, 2002, all pursuant to the PAPS. *See* Pls.' Mem. at 6.[3] On August 2, 2002, DCPS submitted to ETS and Rock Creek a second, untimely dispute letter that indicated the aggregate amounts that DCPS had approved for reimbursement through Cycle 5, and a schedule of reimbursement amounts listed by student. *See* Henning Decl. ¶ 4; Henning Decl., Ex. 1, Letter Memorandum Re: Notification of Monthly Amounts to Be Paid to ETS, Inc. from PAPS for Months Encompassing Cycle 5, July and August 2002, dated August 2, 2002 ("Cycle 5 Letter"). The "approved" reimbursements were much smaller than the amounts submitted by invoice to DCPS by ETS and Rock Creek. *See id.* ¶ 14.

Although the basis for the lower amount proffered by DCPS was unclear from the Cycle 5 Letter, DCPS in effect unilaterally and retroactively to July 1, 2002 reduced by approximately 40% the rate at which DCPS will reimburse ETS and Rock Creek for services provided. *See* Henning Decl. ¶¶ 4, 8. DCPS also unilaterally and retroactively to July 1, 2002 implemented a

new policy cutting reimbursement to ETS and Rock Creek for special education students whose monthly attendance rate falls below 60%. As of July 1, 2002, DCPS calculated reimbursement for those students at a per diem rate only for the days actually attended by the student as opposed to a standard rate. *See id.* ¶ 9. Plaintiffs represent that this policy has not been imposed on any other provider. *See* Pls.' Mem at 6.

DCPS failed to provide ETS and Rock Creek with the reasons for its reduction of the Cycle 5 reimbursement amounts—that is, the new policies—either in advance of the reduction or in the Cycle 5 Letter itself. Although ETS and Rock Creek sought an explanation for the lower payments set forth in the Cycle 5 Letter, DCPS did not respond to the providers' request. *See* Henning Decl. ¶¶ 5–7. The only written notice of the changes in rate and attendance policies that ETS and Rock Creek received was contained in a footnote in an internal DCPS memorandum, dated October 15, 2002, that DCPS distributed to ETS and Rock Creek. *See* Henning Decl., Ex. 4, Memorandum Re: Cycle 5 Reconciliations of ETS/RCA "Actual" Invoices at 3. This so-called reconciliation memorandum reflected DCPS's intention to reduce its September payment to the schools to reflect the retroactive rate as applied to Cycle 5. At that point DCPS had already partially paid ETS and Rock Creek for Cycle 5; so DCPS intended to recoup the difference by setting off the amount of the retroactive Cycle 5 reduction against the already reduced amount of its September payment to the providers. *See* Henning Decl. ¶¶ 15–16.

---

**3.** July and August together make up the fifth cycle ("Cycle 5") of the PAPS five-cycle school year as designated by the PAPS order in place at that time. *See Petties v. District of Columbia,* No. 95-0148, Order Supplement-

ing October 17, 2000 Order Modifying the Automatic Payment System (Setting Payment Schedule for 2001–2002 School Year and Summer 2002) ("Order of Aug. 2, 2001") at 1.

In support of their motion, plaintiffs submitted two declarations of Richard T. Henning, the Chief Executive Officer of ETS and Rock Creek. *See* Henning Decl. ¶ 1. These declarations describe the financial crisis ETS and Rock Creek currently face as a result of DCPS's failure to pay for services provided. Mr. Henning states that in their current financial position, ETS and Rock Creek will be unable to make payroll on November 15, 2002, which will result in the departure of a significant number of ETS and Rock Creek employees and ultimately the closure of the schools. *See* Plaintiffs' Reply to Defendants' Opposition to Plaintiffs' Motion for a Temporary Restraining Order ("Pls.' Rep."), Ex. D., Supplemental Declaration of Richard T. Henning ("Henning Supp. Decl.") ¶ 6. ETS and Rock Creek already have reduced operations and terminated thirty employees, *see* Henning Decl. ¶ 12, and Mr. Henning personally loaned the providers $ 32,000 to enable them to meet the November 1, 2002 payroll. *See* Henning Supp. Decl. ¶ 5. In addition, ETS and Rock Creek currently are unable to pay overdue and forthcoming payroll taxes, rent payments and outstanding accounts payable for utilities and supplies. *See* Henning Decl. ¶¶ 11, 17, 19; Henning Supp. Decl. ¶¶ 8–10. As a result, the two providers represent that unless they are paid by defendants for services provided, they will have to close their doors on or shortly after November 15, 2002. *See* Henning Supp. Decl. ¶¶ 1–3, 6–8. The two declarations of Mr. Henning are unrebutted by defendants.

Plaintiffs ask the Court to enjoin defendants "from jeopardizing the placements of these class members by ordering Defendants to continue to pay for the students' educational and related services at the current established rates until such time as alternative rates are negotiated or the class members have been provided other appropriate placement options and have had an opportunity to fully exercise their due process rights in accordance with the Individuals with Disabilities Education Act ('IDEA'), 20 U.S.C. §§ 1400, *et seq.* and implementing regulations." Motion for a Temporary Restraining Order at 1.

## II. DISCUSSION

### A. *Standard for a Preliminary Injunction*

In deciding whether to grant emergency injunctive relief, the Court must consider (1) whether there is a substantial likelihood that plaintiffs will succeed on the merits of their claims, (2) whether plaintiffs will suffer irreparable injury absent an injunction, (3) the harm to defendants or other interested parties (balance of harms), and (4) whether an injunction would be in the public interest or at least not be adverse to the public interest. *See Serono Laboratories, Inc. v. Shalala,* 158 F.3d 1313, 1317–18 (D.C.Cir.1998); *Sea Containers Ltd. v. Stena AB,* 890 F.2d 1205, 1208 (D.C.Cir. 1989); *Washington Metro. Area Transit Comm'n v. Holiday Tours, Inc.,* 559 F.2d 841, 843 (D.C.Cir.1977); *Milk Industry Foundation v. Glickman,* 949 F.Supp. 882, 888 (D.D.C.1996).

Plaintiffs are not required to prevail on each of these factors. Rather, under *Holiday Tours,* the factors must be viewed as a continuum, with more of one factor compensating for less of another. "If the arguments for one factor are particularly strong, an injunction may issue even if the arguments in other areas are rather weak." *CityFed Fin. Corp. v. Office of Thrift Supervision,* 58 F.3d 738, 747 (D.C.Cir.1995). An injunction may be justified "where there is a particularly strong likelihood of success on the merits even if there is a relatively slight showing of irreparable injury." *Id.* Conversely, when

the other three factors strongly favor interim relief, a court may grant injunctive relief when the moving party has merely made out a "substantial" case on the merits. The necessary level or degree of likelihood of success that must be shown will vary according to the Court's assessment of the other factors. *Washington Metro. Area Transit Comm'n v. Holiday Tours, Inc.*, 559 F.2d at 843–45. In sum, an injunction may be issued "with either a high probability of success and some injury, or vice versa." *Cuomo v. United States Nuclear Regulatory Comm'n*, 772 F.2d 972, 974 (D.C.Cir.1985).

B. *Likelihood of Success on the Merits*

1. Violation of the IDEA

■ As this Court held in *Petties I*, DCPS's failure to timely and fully pay the private providers and the resulting threat to student placements constitute a unilateral change in placement in violation of the IDEA. To stress again, when DCPS's failure to pay leads providers "to discontinue existing placements . . . or to discontinue providing services to [plaintiffs]," the "continued late and partial payments of tuitions and for related services by the DCPS will lead to unilateral changes in students' placements." *Petties v. District of Columbia*, 881 F.Supp. at 66. Such unilateral changes in placement without notice and an administrative due process hearing (when requested) is a clear violation of the IDEA. *See id.*; 20 U.S.C. § 1415.[4]

Plaintiffs have demonstrated a substantial likelihood of success on the merits of their claim that DCPS violated the IDEA. DCPS once again has failed to make pay-

ments to private providers, which threatens to result in the discontinuation of all services by ETS and Rock Creek and the displacement of 151 special education students. Defendants' effort to distinguish the current circumstances from the situation presented to the Court in 1995 by asserting that the students will not lose their placements with the close of ETS and Rock Creek is unavailing. DCPS claims that no change in placement will occur because it has found new placements with other providers for all 151 students. As discussed in greater detail in Section II(C), *infra*, however, DCPS's proposed action does not provide the students with the procedural due process to which they are entitled by law under the IDEA before any change in placement occurs.

2. Violation of the Orders of the Court

DCPS also is in violation of the orders of the Court relating to payment to private providers. DCPS has no legitimate reason for its failure to pay in accordance with the PAPS orders that were in place through September 2002. In its Order of June 29, 1995, the Court explicitly directed DCPS to pay all invoices in full within 30 calendar days of receipt or, if disputed, to submit written notice of the amount disputed and the specific reason for the dispute to providers within 15 calendar days of DCPS's receipt of said invoice. Order of June 29, 1995 ¶ 4. Under the PAPS system, specific deadlines for payment and, by extension, for disputes of payments, were established for the payment cycle in question. *See* Order of Aug. 2, 2001; Order of Oct. 11, 2002. Although DCPS submitted a timely

---

4. DCPS invites the Court to separate the "payment" issues currently before the Court from the issues surrounding DCPS's duty to comply with the due process requirements of the IDEA. *See* Defendants' Memorandum of Points and Authorities in Opposition to Plaintiffs' Motion for a Temporary Restraining Order ("Defs.' Mem.") at 9–10. This is not possible, because DCPS's failure to pay the providers and its concurrent failure to ensure that the students' due process rights will be protected in its "relocation" plan combine to produce the unilateral change in placement that this Court has held violates the statute.

dispute of the Cycle 5 proposed payment amount to the providers, DCPS also submitted additional disputes one month after the dispute cut-off date. At neither point did DCPS indicate to ETS and Rock Creek that the amounts were in dispute as a result of changes being made in the DCPS rate and/or attendance policy. DCPS thus failed to abide by the procedures for payment disputes unequivocally established by Court order because it neither entered its dispute in a timely fashion nor provided the specific reasons for the dispute.

Furthermore, DCPS chose the untimely dispute of payments on August 2, 2002 as the mechanism through which to implement its new policies (and even then it failed to explain those new policies to the affected schools). Such action flies directly in the face of the Court's opinion of May 12, 1995, in which the Court condemned such misuse of the payment process. *See Petties v. District of Columbia,* 888 F.Supp. 165 (D.D.C.1995) (*"Petties II "*). In the spring of 1995 DCPS notified private providers that it would not pay tuition or provide transportation for privately placed DCPS students after June 9, 1995 as a result of DCPS's decision to end its own public school year early for financial reasons. The Court held defendants in contempt of this Court's Order of March 17, 1995 (*Petties I* ), for DCPS's unilateral announcement to private providers that it would not pay tuition or provide related services for DCPS students after the end of the DCPS school year. As the Court explained in its opinion in Petties II:

> Defendants' unilateral decision to cut off funding . . . is the same type of unilateral policy decision that undermines the individualized educational decision inherent in the IEP, and it violates the IDEA. . . . [By unilaterally shortening the school year for these children] the very harms that were of concern to the

Court in deciding to grant the Preliminary Injunction will be exacerbated for these students, children of tender ages who are already physically or emotionally disabled and are less able than most to cope with physical or emotional stress.

*Petties v. District of Columbia,* 888 F.Supp. at 170–71. DCPS has a right to dispute specific payment amounts it is charged by a private provider and even to change the rates it will pay, but until this litigation is finally resolved it may do so only through the mechanisms established by this Court to implement the IDEA. By its unilateral action, DCPS once again has failed to follow the paths legitimately available to it.

Defendants claim that because DCPS has a duty to ensure that payments of public funds to private providers are both timely and reasonable, it could not pay ETS and Rock Creek what DCPS considered unreasonable rates. *See* Defs.' Mem. at 12. Defendants also assert that in withholding payment DCPS was attempting to respond to the recent findings by the D.C. Auditor of waste, abuse and mismanagement in the expenditure of public funds. *See id.* While the Court endorses DCPS's commitment to meet the needs of its special education students in a fiscally responsible way, such an effort may not be made in violation of the orders of this Court and the requirements of the IDEA. *See Fisher v. District of Columbia,* 828 F.Supp. at 90 n. 9 ("[t]he Court cannot permit the District to transfer its budgetary problems to these special-needs children and their parents."); *Cox v. Brown,* 498 F.Supp. at 830 ("[u]nless reasonable appropriate alternatives are available the rights cannot be constricted by monetary limitations"). The Court concludes that plaintiffs have a substantial likelihood of succeeding on their statutory claims and on their claim

that DCPS has violated clear directives of this Court:

## C. *Irreparable Harm*

■ Because the Court finds a substantial likelihood that plaintiffs will succeed on the merits of their claims, DCPS's assertion that the students at issue do not face irreparable harm becomes the central focus of this motion. Through the declaration and supplemental declaration of Richard K. Henning, plaintiffs have adequately demonstrated that the closure of ETS and Rock Creek is imminent if DCPS is not required to make prompt payment for services rendered by those institutions. *See supra* Section I(B). Plaintiffs also have demonstrated that if ETS and Rock Creek close, the 151 class members at those schools are likely to suffer irreparable harm. The declarations of Angelia Henderson and Linda Falkner–Fonzin are strong evidence of the toll that such displacements will take on the individual students. *See also* Brock Decl. ¶¶ 13–22.

Class member Angelia Henderson's seven-year-old son H. is a severely disabled student receiving services at ETS. *See* Pls.' Rep., Ex. A, Declaration of Angelia Henderson ("Henderson Decl.") ¶ 1. Ms. Henderson states that DCPS initially placed her son in a series of schools that did not meet his educational needs. *See id.* ¶ 5. On October 16, 2000, DCPS held an IEP meeting to determine a placement and plan for the child. *See id.* ¶ 7. After H. was placed at ETS after having missed over four months of his kindergarten year, DCPS and Ms. Henderson reached a settlement agreement whereby H. would attend ETS until DCPS found an appropriate permanent program. To this day, some twenty-two months later, H. remains at ETS awaiting a permanent placement. *See id.* ¶¶ 8–9. Ms. Henderson states that her son has made significant progress as a result of the services provided by ETS and

that a sudden move before he was "emotionally ready" could cause a great setback to his educational development. *See id.* ¶¶ 13, 15.

Ms. Henderson further states that after she was made aware on November 5, 2002 that ETS may be closing, she contacted DCPS in order to be a part of the decision-making process concerning her son. When she eventually spoke to Contessa Lee, the Assistant Director of Nonpublic Day Programs in the Special Education Department at DCPS, Ms. Lee informed Ms. Henderson that she had no knowledge of ETS's possible closing and that H.'s placement at ETS was not at risk. *See* Henderson Decl. ¶ 16. DCPS explicitly avers, however, that it knew of and was taking steps to respond to the possible closure of ETS and Rock Creek by finding alternative places as early as mid-October. *See* Def.'s Mem., Ex. D, Declaration of Ruth Blake ("Blake Decl.") ¶ 11. Such confusion on the part of DCPS does nothing to bolster the Court's faith in DCPS's ability to provide appropriate new placements for the 151 class members at issue in a timely and non-disruptive way.

Linda Falkner–Fonzin's 13–year–old daughter P. suffers from severe emotional, behavioral and medical difficulties, including congenital heart failure. *See* Pls.' Rep., Ex. B, Declaration of Linda Falkner–Fonzin ("Falkner–Fonzin Decl.") ¶ 2. DCPS has unsuccessfully placed P. in several facilities that did not meet P.'s individualized needs and could not address P.'s violent behavior. *See id.* ¶¶ 4–5. On May 28, 2002, a hearing officer determination ("HOD") was issued that directed DCPS to convene a meeting within twenty days of the issuance of the HOD and determine what evaluations were required in order to provide P. with an IEP. Nearly six months later, DCPS has not completed any of tasks directed by the HOD or offered P.

an appropriate permanent educational placement. *See id.* ¶ 6. Currently P. is receiving at-home education through ETS pursuant to a due process hearing determination that she should continue at home until an appropriate placement is made. *See id.* ¶ 11. Ms. Falkner–Fonzin states that P. would regress in her educational development if she were moved from the predictable environment at ETS without a well thought-out transition plan. *See id.* ¶ 13.

DCPS asserts that it has developed and is prepared to implement a comprehensive plan that ensures continued educational placement for each of the 151 class members "with an appropriate service provider and program consistent with each student's [IEP] and/or all Plaintiffs' rights under the IDEA." Defs.' Mem. at 2; *see also* Blake Decl. ¶¶ 12–23. These efforts apparently began in early October when certain ETS staff members called DCPS and reported that ETS was going to have to close its doors. *See* Blake Decl. ¶ 11. Furthermore, DCPS asserts that it has secured transportation for these students and that it is committed to conducting a new IEP review for each student within 30 days *after* placement. *See id.* ¶¶ 13, 21. At oral argument, counsel for DCPS informed the Court that DCPS had not yet notified the parents of its intention to move the students or its specific plan for each student, but that it had drafted letters to each parent and was prepared to send the notices of the new proposed placements pending confirmation of the impending closure of ETS and Rock Creek. Defendants maintain that the new placements will provide each student with an uninterrupted comparable placement and that the promised IEP review and administrative due process hearings meet the due process protections required by law. *See* Defs.' Mem. at 9. The Court disagrees.

The Court concludes that DCPS's intention to relocate students without giving *prior* notice to the parents and a *prior* hearing (if requested) violates the letter and the spirit of the IDEA. As discussed above, the statute provides that once a student's placement has been made, agreed to or determined to be appropriate after an administrative due process hearing, a school system proposing to change the placement must provide written notice to the student's parents delineating the reasons behind the school system's proposed action. DCPS may not change a student's placement without the parents' agreement or a determination in an administrative due process hearing that the change in placement is appropriate and permissible under the IDEA. *See Petties v. District of Columbia,* 881 F.Supp. at 65; *see also Honig v. Doe,* 484 U.S. 305, 327, 108 S.Ct. 592, 98 L.Ed.2d 686 (1988) (citing *Burlington School Comm. v. Massachusetts Dep't of Education,* 471 U.S. 359, 373, 105 S.Ct. 1996, 85 L.Ed.2d 385 (1985)); *Zvi D. by Shirley D. v. Ambach,* 694 F.2d at 906; *Fisher v. District of Columbia,* 828 F.Supp. at 88–89.

In *Honig v. Doe,* the Supreme Court concluded that the clear intent of Congress was to make parental involvement the cornerstone of the placement process under the IDEA. In so finding, the Court emphasized the importance of a parent's right to be notified of each step of a child's educational development:

> Envisioning the IEP as the centerpiece of the statute's education delivery system for disabled children, and aware that schools had all too often denied such children appropriate educations without in any way consulting their parents, Congress repeatedly emphasized throughout the Act the importance and indeed the necessity of parental partic-

ipation in both the development of the IEP and any subsequent assessments of its effectiveness. Accordingly, the Act establishes various procedural safeguards that guarantee parents both an opportunity for meaningful input into all decisions affecting their child's education and the right to seek review of any decisions they think inappropriate. These safeguards include *the right to ... prior written notice* whenever the responsible educational agency proposes (or refuses) to change the child's placement or program.

*Honig v. Doe*, 484 U.S. at 311–12, 108 S.Ct. 592. (emphasis added). Plaintiff parents have a right under the IDEA to be informed *in advance* whenever the school system intends to alter their child's educational "placement *or* program." *Id.* (emphasis added).

Defendants misread the statute when they argue that such notice is not required before DCPS moves the ETS and Rock Creek students to other schools because the moves it intends to make do not constitute "changes in placement" under the IDEA. Any "fundamental change in, or elimination of, a basic element of the educational program" qualifies as "a change in placement." *Lunceford v. District of Columbia Board of Education,* 745 F.2d 1577, 1582 (D.C.Cir.1984) (citing *Concerned Parents & Citizens for the Continuing Education at Malcolm X v. New York City Board of Education,* 629 F.2d 751 (2d Cir.1980)). While the defendants may assert that the secret plans DCPS has for the relocation of these 151 students make no such "fundamental changes," they disregard a critical fact: plaintiffs have a right to challenge this very determination. Under the statute, the parents have a right to challenge any proposed changes in placement in advance of the change taking place and a right to argue that the changes proposed do in fact effect fundamental changes in the student's educational program. *See Roher v. District of Columbia,* Nos. 89–2425, 89–2503, 1989 WL 330800, at *3 (D.D.C. Oct. 11, 1989). Furthermore, in order to challenge a proposed change, a parent must have notice. In fact, this Court has determined the minimum information that must be included in such notice. As Judge Joyce Hens Green stated in *Roher,* such notices of proposed change from DCPS necessarily would have to contain "a description of the proposed program and placement for each child as well as the procedural safeguards available." *Id.* at *4. And once the parents receive notice and assert that there has been a fundamental change in their child's placement, they are entitled to the full panoply of procedural due process rights provided by the IDEA.

It is disingenuous—indeed, Kafkaesque—for the defendants to argue that the burden is on the parents first to identify a fundamental change in a student's educational program in order to raise the claim that there has been a change in placement even though DCPS has not provided notice to the parents of the nature of such proposed change. This is particularly so when one considers the consequences of accepting this view. If plaintiffs lack the basic information necessary to argue that the proposed change is fundamental, they are not (according to defendants) entitled to the benefit of Section 1415(j) of the statute which provides that a child "shall remain in the then-current educational placement" during the pendency of any due process proceedings provided by the statute. *See* 20 U.S.C. § 1415(j). To accept defendants' position would have the effect of allowing DCPS to move any child from any school at any time without prior notice to the parents—even though there is an IEP, a settlement agreement or a hearing officer determination in place.

Such a reading of the statute is nonsensical and such a result is untenable.

The Court finds that plaintiffs will be irreparably harmed unless (1) DCPS makes payments to the providers to secure at least the temporary maintenance of the students' placements at ETS or Rock Creek, or (2) the students are provided with other appropriate placements in accordance with their due process rights under the IDEA. DCPS has not made such payments, and its proposed plan to relocate the 151 students at ETS and Rock Creek before providing notice and other statutory rights to their parents does not secure adequate due process protections. The plaintiffs have demonstrated that the children are at risk of suffering the irreparable harm of losing their educational placements because ETS and Rock Creek will close their doors if the providers are not paid by DCPS.

### D. Balance of Harms and the Public Interest

█ Defendants claim that the injunctive relief sought will substantially harm DCPS, other special education students, and all DCPS students in light of the serious budgetary crisis DCPS currently faces. *See* Defs.' Mem. at 13–14. While the Court appreciates DCPS's financial straits, it cannot accept defendants' implicit claim that financial hardship justifies the risk to the class members that DCPS seeks to impose, a risk that directly results from DCPS's own failure to follow the law. As the Court stated seven years ago: "[D]ifficult financial constraints do not relieve the District of Columbia from its statutory obligations. Unless . . . relief is provided by the City Council or, in this case, the Congress, '[t]he Court's role . . . is to enforce existing law, not to recast the statute to ameliorate the District's financial crisis.'" *Petties v. District of Columbia*, 881 F.Supp. at 70 (quoting *Lampkin v.*

*District of Columbia*, 879 F.Supp. 116, 126 (D.D.C.1995)).

The public interest lies in the proper enforcement of the orders of the Court and the IDEA and in securing the due process rights of special education students and their parents provided by statute. These interests outweigh any asserted financial harm to DCPS. It is important to note in this regard that the independent interests of ETS and Rock Creek are not before the Court. The Court is concerned only with the provision of a free and appropriate education to special education students in the District of Columbia that is consistent with the due process rights provided by the IDEA. DCPS is free to negotiate new rates with ETS and Rock Creek while maintaining the students' placements, or it can begin the steps necessary to place students elsewhere consistent with their statutory rights. DCPS cannot, however, simply unilaterally stop paying the providers, move the students and promise to provide a hearing or a new IEP sometime in the future.

For these reasons, the Court grants plaintiffs' motion for a preliminary injunction pursuant to the separate Order entered on November 14, 2002.

SO ORDERED.

### PRELIMINARY INJUNCTION

Upon consideration of the Plaintiffs' Motion for a Preliminary Injunction, the Defendants' response thereto, the arguments of counsel at a hearing on the Motion on November 12, 2002, and for the reasons stated in open court on November 12, 2002 and to be explicated in this Court's Opinion to be issued next week, it is hereby

ORDERED that, in order to maintain the placements for the class members currently attending Rock Creek Academy ("Rock Creek") and Education Transition

Services ("ETS"), the Motion for Preliminary Injunction is GRANTED; it is

FURTHER ORDERED that the parties will work together to ensure that: (1) the *Petties* class members are provided a free appropriate special education and related services (including transportation), without interruption and at a reasonable cost to defendants; and (2) the *Petties* class members are afforded all procedural rights to which they are entitled under the IDEA, 20 U.S.C. §§ 1400 *et seq.*, the prior orders of this Court and the Court's Opinion in this matter; it is

FURTHER ORDERED that defendants shall pay ETS and Rock Creek the following sums on the following dates:

$ 1,000,000 by 12:00 p.m. on November 15, 2002 (hand-delivered to ETS and Rock Creek); and

$ 500,000 on November 29, 2002; it is

FURTHER ORDERED that defendants continue to make regular monthly payments, and that disputes regarding payments be resolved, in accordance with this Court's October 11, 2002 Order; it is

FURTHER ORDERED that defendants will engage in negotiations with ETS and Rock Creek related to both past due (*i.e.,* Cycle 5 and September) payments and the prospective rates that DCPS will pay for any class member remaining at these providers. The Special Master will monitor the negotiations and report to the Court by December 13, 2002 whether defendants, ETS and Rock Creek have negotiated in good faith and the likelihood that the Special Master's further involvement will be required; it is

FURTHER ORDERED that the Special Master shall facilitate discussions among the parties with respect to procedures to be put in place to ensure the review of or establishment of individual IEPs with respect to the students at ETS and Rock Creek and to ensure that their due process rights are secured and that they receive timely due process hearings and decisions on an expedited basis; in doing so, she shall specifically facilitate a discussion of all of the matters proposed by defendants in Paragraph 7 of their proposed preliminary injunction order that have not been specifically included herein; it is

FURTHER ORDERED that if negotiations regarding the past due payments and future rates or payments are unsuccessful by December 13, 2002, the dispute will be formally referred to the Special Master for resolution pursuant to Rule 53 of the Federal Rules of Civil Procedure; it is

FURTHER ORDERED in the event this matter is referred to the Special Master and it appears that future payments to Rock Creek and ETS will be reduced, resulting in the closure or alteration of programs, the Special Master shall endeavor to structure any such changes so that any detrimental impact on class members is minimized and that all procedural protections of class members are preserved; it is

FURTHER ORDERED that such procedures shall include notice to parents and an opportunity for the parents to invoke their due process rights prior to removing any student from ETS and Rock Creek; it is

FURTHER ORDERED that such procedures shall include ensuring that the student's educational placement stay-put at ETS or Rock Creek during the pendency of any proceedings if, after notice, a parent objects to moving the child and alleges that a fundamental change to some element of the educational placement will occur if the child is moved to the proposed placement; it is

FURTHER ORDERED that District of Columbia Public School ("DCPS") students (whether currently in an "interim," permanent, or equivalent placement) attending ETS and Rock Creek and entitled to transportation as a related service shall continue to be provided with transportation by DCPS pending any proceeding under the IDEA; it is

FURTHER ORDERED that the defendants shall hold due process hearings for any ETS or Rock Creek student requesting such hearing within 30 days of the request except to the extent otherwise agreed; it is

FURTHER ORDERED that defendants shall provide plaintiffs, the Special Master, and private providers of special education and related services with reasonable notice of any new policy, including any attendance policy, directive, rule, regulation or guideline pertaining to payments for special education and related services for class members; and it is

FURTHER ORDERED that a status hearing shall be held on December 19, 2002 at 9:30 a.m.

SO ORDERED.